EDISON SAULT ELECTRIC COMPANY

v.

The UNITED STATES.

No. 400–74.

United States Court of Claims.

March 23, 1977.

Robert D. Wallick, Washington, D.C., atty. of record, for plaintiff. Robert C.

Kline, Jr., Sault Ste. Marie, Mich., and Steptoe & Johnson, Washington, D.C., of counsel.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before COWEN, Senior Judge, and DAVIS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

COWEN, Senior Judge.

Plaintiff, the Edison Sault Electric Company, brings this breach of contract action to recover $296,954.38 in damages arising from the United States' reduction of waterflow to plaintiff's hydroelectric plant at Sault Ste. Marie, Michigan. We agree with the parties that the facts material to a resolution of the issues are not in dispute and that the case may be decided on the motions for summary judgment. For the reasons set forth below, we conclude that plaintiff is not entitled to recover and that defendant's cross-motion for summary judgment should be granted.

The Edison Sault Electric Company (hereafter Edison or Edison Sault) is a Michigan public utility in the business of purchasing, generating, transmitting, distributing and selling electric energy in the Eastern Upper Peninsula of Michigan. Much of Edison's power derives from a hydroelectric generating plant at the Sault Ste. Marie rapids on the St. Mary's River, a point of passage for water emptying from Lake Superior into Lake Huron. Edison Sault purchased the facility in 1962 from the Carbide Power Company, which in turn had purchased it from the original owner and builder, the Michigan Northern Power Company.

Plaintiff's plant was constructed in 1902 and is served by a 2½ mile long canal which diverts water from the St. Mary's River. The plant is ¼ mile long and has 78 horizontally mounted generators with a combined rated capacity of 41,300 kilowatts. Water requirements are approximately 30,500 cubic feet per second (c. f. s.). Since the plant operates by diversion of United States boundary waters, it was necessary for the owners to obtain Governmental authority to divert the boundary waters for private purposes.

Although the United States alone granted authority to construct the facility on the River, the St. Mary's River is in fact a boundary with Canada, the boundary line running through the middle of the River and through the middle of the Great Lakes in either direction from the River. Actions taken by the Government or private parties on either side of the boundary can, and often do have significant effects upon interests on the other side of the boundary. This situation resulted in a number of disputes, which both the United States and Canadian Governments sought to resolve by entering into the Boundary Waters Treaty of 1909.

Thus, 7 years after construction of the facility now owned by plaintiff, the Canadian and American Governments agreed to create an International Joint Commission (hereafter I.J.C. or Commission), composed of three members of each country, to pass over questions affecting the boundary waters of the two countries. Specifically, the Commission was to approve any

* * * uses or obstructions or diversions, whether temporary or permanent, of boundary waters on either side of the [boundary] line, affecting the natural level or flow of boundary waters on the other side of the line * * *. [Boundary Waters Treaty, art. III, 36 Stat. 2448 (1909).]

The jurisdiction of the I.J.C. was to be coextensive with its purposes of water control.[1] Since the ratification of the Treaty

---

1. In addition to Article III's requirement of I.J.C. approval for construction of facilities affecting water level or flow, Article IV of the Treaty requires I.J.C. approval for "construction or maintenance * * * of * * * protective works or any dams * * * the effect of which is to raise the natural level of waters on the other side of the boundary

in 1909, the Commission has exercised jurisdiction over the waters from which plaintiff derives its power.[2]

On March 3, 1909, the United States, in section 11 of the Rivers and Harbors Act of 1909, Pub.L.No.317, ch. 264 §§ 11, 12, 35 Stat. 815, amended the Act of 1902[3] to provide for Governmental acquisition, by condemnation and purchase, of most of the property north of plaintiff's facility and of virtually all the water flowing past Sault Ste. Marie. Thereafter, the plant's owners could use the St. Mary's River waters only by leasing them from the Government, and all leases had to be approved by the Commission. Consequently, in September 1911, the Michigan Northern Power Company (then known as the Michigan Lake Superior Power Co.) applied and began negotiations for a "lease of water for the development of power." As a condition for granting the lease, the parties agreed in negotiations that the company would build "compensating" works—essentially a short dam with movable gates—in the center of the River to insure "a reasonable control of the level of the lake" while guaranteeing the company an adequate supply of power.

On May 26, 1914, the Commission issued its order and opinion granting the power company's application for a lease and requiring construction of the compensating works. As a part of its order, the I.J.C. created an International Lake Superior Board of Control (hereafter Board) to oversee and regulate "[a]ll compensating works [t]heretofore built and all such works built under this order of approval and all power canals" involved in the diversion of the St. Mary's River. The objective of the Board was "to maintain the level of Lake Superior as nearly as may be between levels 602.1 and 603.6 above said mean tide at New York." Additionally, the I.J.C. empowered the Board to "determine the amount of water available for power purposes," and to "cause the amount of water so used to be reduced whenever in its opinion such reductions are necessary * * * to prevent unduly low stages of water in Lake Superior." The Board was to be composed of one officer of the United States Army Corps of Engineers, "charged with the improvement of the Falls of the St. Mary's River on the American side," and one officer appointed by Canada.

The Board has from its inception regulated the elevation of Lake Superior and the outflow of the St. Mary's River. Although the Board has operated under a number of regulatory programs, its present regulatory system was established in 1955. The Rule Plan of 1955, as it is known, derives from a "rule curve" which determines outflow for each month as a function of the mean lake level for the preceding month. The waterflow settings are altered monthly from May 1 to December 1, but from December 2 to April 30 they are altered only when the Lake Superior mean levels fluctuate unusually.[4]

The regulation of the elevation and outflow of Lake Superior was therefore clearly in the hands of the I.J.C., and by its delegation, in the hands of the Board when, in 1950, the United States entered into a new agreement with plaintiff's predecessor "to lease any surplus water available to the United States in St. Mary's River, Michigan, which is not required for the operation of facilities owned by the United States * * *." Under the terms of the lease, the Michigan Power Company took "its re-

---

* * *." Article VIII of the Treaty then grants the I.J.C. jurisdiction over "all cases involving the use or obstruction or diversion of the waters with respect to which under Articles III and IV of this Treaty the approval of this Commission is required * * *."

**2.** For a history of the I.J.C.'s work, *see* 3 Whiteman, *Digest of International Law*, 826–871 (1964). Plaintiff does not dispute the Commission's jurisdiction over the boundary waters; plaintiff *does* dispute the I.J.C.'s juris-

diction over its hydroelectric plant constructed upon those waters. *See* discussion *infra.*

**3.** Act of June 13, 1902, Pub.L.No.154, ch. 1079, 32 Stat. 331, 361.

**4.** Specifically, alterations are made when levels move from a defined normal/intermediate range to a defined maximum or minimum range, or in the reverse.

quirements of water up to a maximum rate of flow of 33,000 c. f. s." in exchange for payment of $100,000 annually. The lease also contained the following clause:

SECTION 2—It is mutually understood and agreed that this lease is made subject to the riparian rights of the lessor and to the rights of any lessee or lessees under any lease or leases for water power already made by the lessor and to any rules and regulations established or recommended by any International Commission that have or shall become operative * * and the leasee [sic] shall neither assert nor make any claim for damages as against the lessor by reason of any such diminution made for such cause.

On October 1, 1962, after purchasing the power company from Carbide Power, Edison Sault entered into a novation agreement with the United States, agreeing to assume all Carbide's rights and obligations under the lease, including rights and obligations assumed by Carbide in three supplemental agreements. Hence plaintiff is now the lessee under the 1950 lease, contract DA–20–064–Eng88 (hereafter DA–88).

For the most part, Edison Sault continued as lessee without incident until 1972. On June 30, 1970, it executed an amendment to the DA–88 contract, extending the term of lease until June 30, 2000. In July and September of 1972, extremely heavy rains hit the Great Lakes region, at a level 30 percent in excess of the normal rainfall for the season. The rains came at a time when the water levels of Lakes Michigan and Huron were more than 2 feet above the long-term average.

On September 27, 1972, Michigan congressman John G. O'Hara, alarmed by the ominously high water levels on the lower Great Lakes, wrote the I.J.C. requesting that it immediately review and reconsider its Rule of Regulation to permit consideration of water levels of lower Lakes in fixing the appropriate level of Lake Superior. Congressman O'Hara noted that the water level of Lake Superior, in contrast to the levels of the lower Lakes, was only 5″

above long-term average and 2½″ above the level for the same time in the previous year.

The Chairman of the I.J.C., Christian Herter, replied that the question raised by the Congressman was precisely the subject of a "complex study," which was initiated in 1964 and would be completed within a year, and that any action would have to await the completion of the study.[5] On November 8, 1972, the I.J.C. denied Congressman O'Hara's request on the ground that it could not alleviate the situation on the lower Lakes without "magnifying damage" on Lake Superior.

Heavy floods hit the Great Lakes 6 days later. Damage was so extensive that much of the lakeshore property (including virtually all of Congressman O'Hara's district) was declared a disaster area and made eligible for Federal relief funds.

On November 28, 1972, the Conference of Great Lakes Congressmen met to consider the problems of water control on the Great Lakes. Three days later, the 34 Congressmen wrote to the President requesting the Executive Branch to take appropriate action to relieve the situation on the lower Lakes and to insure that similar situations would not recur. Among the actions proposed by the Congressmen was a bilateral governmental request to the I.J.C. to "impound" water on Lake Superior as a function of the water levels of the lower Lakes. The President responded favorably to the Congressmen's request and directed his representative to meet with them on the matter.

On January 26, 1973, the United States Department of State made an emergency application for relief to the I.J.C. The United States requested that the Commission amend its order of 1914 to authorize and direct the United States:

1. To reduce water releases for power generation through power canals or other facilities operated under the authority and jurisdiction of the United States in the St. Mary's River to the

---

**5.** The report was ultimately released in October 1973. *See* Plaintiff's Exhibit S.

extent necessary or feasible, in the judgment of the United States, to relieve the critical high water conditions on the lower Great Lakes * *.

2. To restrict or prevent such flows for such periods as the United States may deem necessary, in no event longer than six months, or until the I.J.C. shall direct that such flows be restored.

The United States requested that the I.J.C. suspend such of its rules as might be necessary to act upon the Government's emergency application.

The I.J.C. met in executive session to consider the request of the Department of State. There was a great deal of discussion among the Commission members and representatives as to what would be the most appropriate permissible action. J. L. McCallum, the legal advisor to the Canadian Section, stated that the intent of the 1914 orders and the Commission's authority under the 1909 Treaty were to protect people and property from injury caused by the works approved. He said he found nothing in the Treaty or the 1914 orders which would permit the Commission to amend the orders regarding regulations. Major General E. Graves, chairman of the United States Section, disagreed. He stated in substance that there was nothing in the 1914 orders that established flows for high water conditions and therefore felt that the Commission, consistent with the orders, could alter the flows to accomplish the results requested by the United States.

The I.J.C. resolved its doubts in favor of immediate action. On January 30, 1973, it directed the International Lake Superior Board of Control to reduce Lake Superior outflows from 71,000 to 55,000 c. f. s. for a 3-month period from February 1 to April 30, 1973. The order stated that the reduction was to be achieved chiefly by reducing the flow for power generation on the United States side of Sault Ste. Marie. The Commission further instructed the Board to deviate from its current regulation plan for the duration of the 3 months and to release

the minimum quantity of water consistent with other requirements. The Commission also resolved that during the 3-month period, it would be considering a new regulation plan, which would for the first time permit regulation of Lake Superior as a function of lower Lake levels.

At the time the reductions in flow were ordered, the water level in Lake Superior was within the range of the 1955 Rule Curve and within the levels specified by the I.J.C.'s Orders of Approval of 1914. The effect of the reductions was to raise the water level in Lake Superior to a higher level than had previously been considered desirable under the prevailing Rule Curve.

Plaintiff first experienced the effect of the Commission's order on February 2, 1973, when it received a telegram from Colonel Myron D. Snoke, an employee of the United States Army Corps of Engineers. The telegram was an order to plaintiff to reduce the water flowing through its hydroelectric plant to a monthly average flow of 17,800 c. f. s. The directive was effective February 1 and was to continue until further notice. On March 22, plaintiff received another telegram from Colonel Snoke directing it to reduce the flow to 15,000 c. f. s. for the remainder of March; the April flow was to be restricted to about 15,000 c. f. s.

On the authority of an I.J.C. directive, the Board, on April 30, 1973, ordered plaintiff to again reduce its water flow from May 1 through June 30, 1973, to an average monthly rate of 14,700 c. f. s. Then, on May 29, the Department of the Army, "[b]ased on instructions from the International Joint Commission and the Lake Superior Board of Control" directed Edison to reduce its flow even further, to 14,000 c. f. s. for the month of June 1973.

On July 1, 1973, plaintiff was allowed to release 33,000 c. f. s. of water through its power canal, thus restoring a full flow to its hydroelectric plant.

During the period of February 1, 1973 through June 30, 1973, the rate of flow to the United States-owned hydroelectric facility on the St. Mary's River was not reduced, nor was the flow to the hydroelectric

facility of Great Lakes Power Company, Ltd., successor to Algoma Steel, located on the Canadian side of the St. Mary's River, reduced. As a result of the reduction in the flow of water to its plant during the period stated, it was necessary for plaintiff, in order to meet its connected loads and contractual obligations, to purchase alternative energy from Consumers Power Company at increased costs which amounted to $296,954.38.

Just prior to issuance of its order returning the flow to normal levels, the I.J.C., in June 1973, released a "Special Interim Report on Regulation of Lake Superior Outflows to Provide Relief From High Water Levels on the Lower Great Lakes." In this report the Commission for the first time officially proposed a plan of regulation of Lake Superior which took into consideration the water levels of the lower Lakes. The Commission declared that the objective of regulating the outflow of Lake Superior should be to provide benefits throughout the Great Lakes system without undue detriment to Lake Superior. However, the Commission stated that it should be given authority which it did not have to accomplish that objective. In that connection, the I.J.C. report stated:

> * * * adoption of a regulation plan for Lake Superior which takes into account the levels of Lakes Michigan-Huron constitutes a departure from the objectives and criteria prescribed in the Commission's Orders of Approval of May 26 and 27, 1914. It is the Commission's considered opinion that it cannot adopt the new objective and criteria under the terms of these Orders of Approval, which are still in force. Moreover, in these Orders of Approval, the Commission did not retain jurisdiction to amend the Orders so as to establish new regulation objectives and criteria.

The report further stated that the emergency action which reduced the outflow from Lake Superior between January 30, 1973 and June 30, 1973, had had a net beneficial effect and was consistent with the proposed regulation objectives. There-fore, the Commission concluded that, unless otherwise instructed by the Canadian and American Governments, it would continue on a temporary basis a course of action consistent with these regulation objectives.

At about the same time that the Joint Commission issued its Interim Report, plaintiff presented a breach of contract claim to the Secretary of the Army. Edison's claim, filed on June 11, 1973, was denied by the Secretary of the Army by letter dated July 25, 1974, and this suit followed.

It is Edison Sault's contention that the United States breached its contract DA–88 with plaintiff by reducing the water flow for the 5-month period from February 1 to June 30, 1973. Plaintiff maintains that the I.J.C. had no authority to order the reduction; that the reduction was an act of the United States, performed in its contractual capacity, and that the cutback was a direct violation of the terms of contract DA–88. Edison Sault supports its argument that the United States acted in its contractual capacity and not as a sovereign by the fact that only Edison Sault was forced to reduce its flow, while the other power facilities on the river remained unaffected.

I.

Plaintiff recognizes that all of its arguments in behalf of its breach-of-contract theory proceed on the assumption that the order to reduce the water flow was an act of the United States in its contractual capacity. Plaintiff seeks to establish that the reduction was such an act of the United States on the basis of the following facts and legal assertions. First, plaintiff points out that it was the United States Government which applied in the first instance for a reduction-of-flow order from the I.J.C.; the application was made because of damages to United States lower Lakes interests, who were able to exert considerable political pressure upon Congress and the Executive Branch. Second, plaintiff notes that it was an employee of the United States, Colonel Snoke, who actually ordered the flow reductions. Third, plaintiff asserts

that the order could only have been an action of the United States as a matter of law, because the I.J.C. lacked jurisdiction over plaintiff. Finally, plaintiff calls attention to the fact that the determination as to which plant would bear the effects of a flow cutback was made exclusively by the United States Army Corps of Engineers without consultation with the I.J.C.

■ We disagree with plaintiff's principal contention, because we find that the order to reduce water flow was not an act of defendant but was, instead, the result of directives issued by the Commission, for which the United States may not be held liable. It is well settled where a claim is based upon an act of a third party not in privity with the United States, there can be no recovery against the Government. *Josef Best v. United States*, 292 F.2d 274, 154 Ct.Cl. 827, 836 (1961); *Rose Marie Porter v. United States*, 496 F.2d 583, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975).

■ For the United States to be liable for acts of a third party, the third party must, at the least, be an "agency or instrumentality of the United States acting within the scope of its authority in entering into the disputed agreement and thereby binding defendant as a principal to it." *Rose Marie Porter v. United States, supra,* 496 F.2d at 587, 204 Ct.Cl. at 360. The mere fact that the United States participates in the actions of the third party—in this case through its membership in the I.J.C.—does not establish an agency relationship where the third party is a sovereign body which may, at its option, act independently of the wishes of the United States. For example, in *Josef Best v. United States, supra,* the defendant was not held liable for action taken by the independent Allied High Commission of Germany, even though the United States was a member of that Commission.

■ Similarly, the facts relied upon by plaintiff are insufficient to establish an agency relationship between the United States and the I.J.C. The fact that the United States was the party which petitioned the I.J.C. to issue the directives cannot be deemed to make the I.J.C. an agent of defendant. The I.J.C. is a sovereign body which was free to reject the application of the United States if it had so decided. The situation is analogous to that before this court in *Anglo-American Trading Corp. v. United States*, 109 Ct.Cl. 859 (1948), where we held that the United States could not be held liable for a trade embargo imposed by New Zealand, even though New Zealand was "induced" to order the embargo by acts of the United States.[6] The rule announced in that case is that the Government does not become a principal to an action by suggesting that action to a third party, so long as the third party is free to reject the Government's suggestion.

■ Plaintiff's second argument is that the Government should be held liable because the orders to reduce water outflow were given by a United States employee, Colonel Snoke of the U.S. Army Corps of Engineers. This argument overlooks the fact that while Colonel Snoke was an employee of the U.S. Army, his superior, General Graves, was a member of the International Lake Superior Board of Control. The Commission's 1914 Order of Approval, which created the Board, specified that one member of the Board be an "officer of the Corps of Engineers." The fact that the Board used Colonel Snoke and other employees of the Corps of Engineers as vehicles for issuing the orders to plaintiff did not make the orders the act of the defendant, especially since the orders stated that the cutback was by order of the I.J.C. and the Board.

The record is clear that when Colonel Snoke and other employees of the Corps of Engineers ordered plaintiff to reduce the water outflow, they acted as representa-

---

**6.** To an extent, the *Anglo-American Trading Corp.* case differs from the present dispute in that the court there also held that a trade embargo was a sovereign act for which defendant could not be liable even if it were the principal.

tives of the Board in implementing the order of the I.J.C. and not as employees of the defendant. The orders from the Board, transmitted through Colonel Snoke and others, were in compliance with the directives of the Commission. In its first directive of January 30, 1973, which ordered the cutback on Lake Superior outflows, the I.J.C. instructed the Board to take the action required to achieve the objective and stated that the "reduction will be achieved in large measure by reducing the flows for power generation on the United States side of the international boundary at Sault Ste. Marie." Manifestly, the I.J.C. had to act through the Board, and General Graves, the United States member of that Board, was the superior of Colonel Snoke. Moreover, the reduction orders specifically stated that they were issued in accordance with I.J.C. directives. The very first telegram sent to plaintiff on February 1, 1973, stated that it was issued "to implement an order dated 30 January 1973 of the International Joint Commission to the International Lake Superior Board of Control." Similar language appeared in subsequent reduction orders, including the letter sent to plaintiff on May 29, 1973. Plaintiff was therefore expressly informed that the reduction orders were issued on the basis of instructions which the Corps of Engineers received from the Commission and the Board.

It is a reasonable inference from the documentary evidence before us that the Commission was kept informed regarding the reduction in water releases for power generation on the United States side, including plaintiff's plant in the St. Mary's River, and that the Commission ratified the action that had been taken through its Board with knowledge thereof. On April 13, 1973, William A. Bullard, member of the United States Section and Secretary of the I.J.C. wrote to General Graves, the United States member of the Board, stating that the Commission had reviewed the Interim Report of the Great Lakes Level Board dated March 15, 1973 and had concluded that the period during which the outflow of Lake Superior would be reduced should be extended to June 30, 1973. The letter referred to the I.J.C.'s understanding that the reduction would be achieved "in large part by reducing water releases through the power generation facilities in the United States." Again on June 29, 1973, Mr. Bullard wrote General Graves, sending him a copy of the Commission's "Special Interim Report on Regulation of Lake Superior Outflows to Provide Relief From High Water Levels on the Lower Great Lakes." That report was dated June 28, 1973. The letter stated that the emergency action taken by the Commission to reduce the outflow from Lake Superior had had a net beneficial effect and that it was the intention of the Commission to continue the same course of action on a temporary basis.

■ Persisting in its argument that the reductions were ordered by the defendant rather than by the I.J.C., plaintiff asserts that this had to be so because of the I.J.C.'s lack of jurisdiction over Edison Sault, This lack of jurisdiction is inferred from: (a) plaintiff's interpretation that Article VIII of the 1909 Boundary Waters Treaty required that only *new* diversions of water be approved by I.J.C. and therefore gave it no control over plaintiff's facilities which were already in existence before the Treaty was made; and (b) that in the I.J.C.'s Opinion of May 26, 1914, on the application of plaintiff's predecessor, the Michigan Northern Power Company, it was stated that plaintiff's works were "wholly within" the jurisdiction of the United States. We find both of these contentions are without merit.

It is true that Article VIII of the Treaty limits the jurisdiction of the Commission to cases involving the use, obstruction or diversion of waters covered by Article III. Article III states:

> * * * in addition to the uses, obstructions, and diversions heretofore permitted or hereafter provided for by special agreement between the Parties hereto, no further or other uses or obstructions or diversions, whether temporary or permanent, of boundary waters on either side of the line * * * shall be made except * * * with the approval, as hereinafter provided, of a joint commis-

sion, to be known as the International Joint Commission.

Plaintiff overlooks the word "uses" in the Treaty. Although plaintiff's plant was built before the creation of the Commission, plaintiff's "use" of the St. Mary's River waters has continued incessantly since that time. Moreover, when on June 30, 1970, plaintiff entered into an agreement with the United States which extended the term of the lease from 1980 to the year 2000, a new "use" was thereby created. The very fact that plaintiff's predecessor, the Michigan Northern Power Company, filed an application with the Commission on June 30, 1913 for approval of the obstruction, diversion and use of waters of the St. Mary's River on the United States side of the boundary, was itself a recognition of the jurisdiction of the Commission concerning the power company's use of boundary waters.

Plaintiff's assertion that the Commission in its Opinion of May 26, 1914, ruled that it lacked jurisdiction over the hydroelectric plant is, we think, based upon an erroneous interpretation of the 1914 Orders of Approval. The Commission did not rule that it lacked jurisdiction over plaintiff's hydrolectric facility. Rather, it noted that:

* * * the *position of the Government of the United States* is that the works of the applicant, being *located* wholly within its jurisdiction, it should be given full and final authority and control over their operation; * * *. [Emphasis added.]

Not only did the Commission use the term "jurisdiction" in describing the *position of the United States*, it also used the word to mean something other than the legal authority of the Commission. The word "located" indicates that the I.J.C. meant to characterize plaintiff's plant as being wholly within United States *boundaries.*

Moreover, the Commission in its Opinion went on to point out that:

* * * the power of the commission, as a condition of its order, to place the control of these works, and the authority for the exercise of that control, exclusively under the Government of the United

States, or under the joint control of both Governments is not disputed. * * *

As is evident, the Joint Commission would not have asserted its "power * * * to place the control of these works * * * under the joint control of both Governments" if it did not first assume that it had *a priori* jurisdiction over plaintiff's facility. Thus it is clear that the Commission's order, rather than declining jurisdiction over the hydroelectric plant, actually *asserted* authority over it.

Plaintiff makes a final contention in support of its position that the reduction was an act of the United States. This is so, plaintiff says, because the cutback was based solely on the report of the United States Army Engineers, and as a result of the report, only plaintiff's facility was adversely affected by the I.J.C. order, while other United States facilities were left untouched.

The record shows that when the defendant contemplated the filing of an application with the I.J.C. for a cutback in the outflow from Lake Superior, it requested the Corps of Engineers to make a report on the impact of closing down the Government-owned hydroelectric power facility at Sault Ste. Marie. On January 17, 1973, the Corps of Engineers reported that while Edison Sault could find alternative power sources, the power deficiencies that would result from the shutdown of the Government-owned plant could not be compensated from other areas. The report also stated that the largest consumer of the energy provided by the Government-owned plant was the Kincheloe Air Force Base, a fully operational SAC base, and that any reduction in the energy supplied to that base would have "serious defense implications."

The fact that the reduction orders were based upon that report does not make the reductions an act of the United States. The directive issued by the I.J.C. vested discretion in the Board as to the manner in which the directive should be executed. The report provided a factual background—a rational basis—for deciding among difficult choices. Under all circum-

stances, we cannot say that the way in which the I.J.C. order was implemented was arbitrary or a gross abuse of the discretion reposed in the Board. Therefore, the act did not give rise to liability on the part of the United States. *See, Restatement (Second) of Agency*, §§ 7(c), 17, 345 (1958).

■ At this point it should be noted that the International Joint Commission is an international organization which has been granted immunity from suit by the laws of the United States, except where it has expressly waived such immunity, 22 U.S.C. § 288 (1970). There is no evidence or any claim by plaintiff of any waiver of immunity by I.J.C. Since we have held that the actions complained of by plaintiff were the acts of such an international organization, it follows that plaintiff may not recover for the damages occasioned by such actions.

## II.

■ Although we hold that the defendant is not liable for breach of contract, because the alleged acts of breach were acts of the Commission, we would find no breach here even if the acts had been committed by the United States. We interpret the contract of lease, DA–88, to grant defendant the right to act as it did in implementing the directive of the Commission. The relevant contract provision is section 2 of the 1950 lease agreement, which makes the rights of the lessee (now plaintiff) subject to:

> * * * any rules and regulations established or recommended by any International Commission that have or shall become operative, * * *.

Plaintiff contends that this section does not permit defendant to avoid liability, because the I.J.C.'s action was not a "rule or regulation" within the meaning of the contract. This is true, plaintiff says, because the action of the Commission exceeded the guidelines of the Rule Curve or regulation plan then in effect, and the Commission admitted as much in its Interim Report of June 1, 1973, which stated that in the 1914 Orders of Approval "the Commission did not retain jurisdiction to amend the Orders

so as to establish new regulations objectives and criteria."

However, plaintiff's argument misses the point of the contractual provision in question. The issue is not whether the I.J.C. retained jurisdiction to adopt a *new* regulation plan under the 1914 Orders, nor is the issue whether the Commission could *amend* the Orders to establish a new rule plan. The Commission conceded that it could not take either course of action. Rather, the question before us is whether the Commission's action in *temporarily suspending* its regulation plan in response to a perceived *emergency*, may be considered a "rule or regulation" within the meaning of the lease contract. We think that it may be so considered.

■ The State Department's application for I.J.C. action in this case requested the Commission to "suspend such of its Rules as may be required for immediate consideration of the Application, pursuant to Rule 9 of the I.J.C. Rules of Procedure." Rule 9 of the Commission's Rules of Procedure, of which we may take notice, reads as follows:

> 9. The Commission may suspend, repeal, or amend all or any of the Rules of Procedure at any time, with the concurrence of at least four commissioners. Both Governments shall be informed forthwith of any such action.

Even more broad than Rule 9, is Rule 10:

> 10. The Commission may, at any time, adopt any procedure which it deems expedient and necessary to carry out the true intent and meaning of the Treaty.

We think these rules reserved in the Commission sufficient authority to consider and act upon the United States' application for emergency relief in this case. It would be unreasonable to hold that the Commission, by its 1914 Order of Approval, tied its own hands so as to prohibit any temporary action outside its Rule Curve regardless of the gravity of the emergency. A necessary aspect of a Commission's power to make rules in exercise of its authority is the ability to suspend those rules in response to an emergency situation and in a reasonable manner. *United States v. O'Brien,* 391 U.S. 367, 380,

88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In that sense, the proper suspension of a rule is as much a "rule or regulation" as the promulgation itself. *See also,* K. Davis, *Administrative Law Text,* §§ 6.01, 6.04, 6.10 (1972).

Additionally, it is important to note the extreme breadth of the clause in the 1950 lease, which makes the lease's provisions subject to any rule or regulation "established or *recommended*" by the Commission. On January 15, 1973, the I.J.C. informed the Lake Superior Board that the Commission was "considering, as a matter of urgency, the possibility of operating the control works at Sault Ste. Marie in such a way as to provide relief for the lower Great Lakes * * *." The Board was requested to report its "interim findings and conclusions with respect to possible modified operation * * *." The Board submitted an Interim Report on March 15, 1973, held hearings in May, and issued another report in June 1973.

As previously stated, in its June 1973 report the Commission acknowledged that it lacked authority to amend the 1914 Orders to establish new regulation objectives and criteria. But in the same report, the Commission stated that the emergency action which had been taken was beneficial and that it proposed to continue the same program on a temporary basis, if there were no objections by the governments of Canada and the United States. These proceedings show that the Commission was considering a new Rule and Regulation at the time of the outflow cutback and the record shows that it did in fact make a recommendation for a rule change in October 1974. It is therefore reasonable to conclude that the Commission's emergency action in 1973 was in accord with the new rule eventually proposed and was taken pursuant to "a rule or regulation * * * recommended by any International Commission * * *."

### III.

Since we have concluded that plaintiff is not entitled to recover for the reasons stated above, we need not consider the Government's defense that plaintiff's claim is barred by the doctrine of sovereign immunity. Accordingly, plaintiff's motion for summary judgment is denied; defendant's motion for summary judgment is granted, and plaintiff's petition is dismissed.