Susan SOUCHERAY et al., Plaintiffs,

v.

CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants.

No. 74–C–109.

United States District Court, W. D. Wisconsin.

Nov. 7, 1979.

Allan R. Koritzinsky, Rikkers, Koritzinsky & Rikkers, Madison, Wis., for plaintiffs.

Frederick J. Erhardt, Asst. U. S. Atty., Madison, Wis., Andrew F. Walch, Asst. Atty. Gen., Land & Natural Resources Division, U. S. Dept. of Justice, Washington, D. C., for defendants.

1. For more background *see Miller v. United States*, 583 F.2d 857 (6th Cir. 1978); *Edison Sault Electric Co. v. United States*, 552 F.2d 326 (Ct.Cl.1977).

## OPINION AND ORDER

LARSON, Senior District Judge, sitting by designation.

This lawsuit involves complex and delicate questions regarding the actions taken by an international agency in regulating water levels in the Great Lakes basin. Both parties have moved for summary judgment. Summary judgment is properly granted only when no genuine issue of material fact remains and a party is entitled to judgment as a matter of law. *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir. 1976); *Federal Deposit Ins. Corp. v. Balistreri*, 470 F.Supp. 752, 754 (E.D.Wis.1979). The Court has decided that summary judgment may appropriately be awarded to the defendants.

This action has a lengthy background.[1] On January 11, 1909, the United States and Canada agreed to the Boundary Waters Treaty of 1909. 36 Stat. 2448; T.S. No. 548. The Treaty's purpose was to settle any questions which might arise regarding the use of the waters along the two countries' borders. The Treaty establishes an International Joint Commission, composed of three members from each country, to approve and regulate the diversion, obstruction, and use of boundary waters.

In 1913 a Canadian and an American company applied to the Commission for permission to build dams and compensating works at the head of St. Marys River, which provides the outlet from Lake Superior to the lower Great Lakes. Orders of Approval for the project were issued in 1914.

The Commission found that the works would allow maintenance of Lake Superior water levels within a more restricted range than previously possible. The range of levels, measured by the monthly mean, for the preceding fifty years had been 3.5 feet. The new works would allow confinement of levels within 2.5 feet, and ordinarily within 1.5 feet—between surface elevations of 600.5 and 602.0 feet.[2] The Commission

2. All measurements are International Great Lakes Datum (1955).

found that "under proper international joint control the levels of said lake may be regulated so as to benefit navigation and reasonably protect the property and interests, public and private, in both countries *above* said works." 1914 Orders of Approval, Paragraph 6 (emphasis added).

Therefore, as a condition of control and operation, the Commission required that the works "be so operated as to maintain the level of Lake Superior *as nearly as may be* between the levels 600.5 and 602.0 and in such manner as not to interfere with navigation." *Id.*, Conditions As To Control And Operation, Condition 5 (emphasis added). To ensure the correct functioning of the works, a Lake Superior Board of Control was created. The American member of the Board is the Division Engineer of the North Central Division of the Army Corps of Engineers. The Canadian member is the Director General, Ontario Region, Inland Waters Directorate, Department of Fisheries and the Environment. The Board's duty is to "formulate rules under which the compensating works and power canals and their head gates and by-passes shall be operated so as to secure *as nearly as may be* the regulation of Lake Superior as set forth herein." *Id.* Condition 7 (emphasis added). *See also* Condition 5.

The Board of Control has adopted a series of regulation plans. The first was in 1916, the "Sabin plan." That plan was supplanted in 1941 by "Rule P–5," which allowed increased outflows for wartime power generation. The "Rule of 1949" was next; it took into account increased supplies to Lake Superior from water diversions in Canada. This was replaced by the "1955 Modified Rule of 1949."

In the early 1970's heavy precipitation raised the levels of the Great Lakes. By 1972, Lakes Michigan and Huron were at such high levels that serious damage was occurring to shoreline property. Congressmen in that area met with the President, requesting that action be taken to prevent further damage. The State Department applied to the International Joint Commission for emergency relief from the high

water levels in the lower lakes, suggesting amendment of the 1914 Orders of Approval. No amendment was forthcoming, but in the spring of 1973, the Commission ordered the Lake Superior Board of Control to reduce outflows from Lake Superior on a temporary basis. On June 29, 1973, the Commission directed the Board to continue to diverge from the 1955 Modified Rule of 1949, using a plan "SO–901" as a guide. This plan considered the levels of the lower lakes in determining discharge from Lake Superior. SO–901 was used as a guide beyond the time when the emergency on Lake Huron ended, March 31, 1977. Plan 1977, a refinement of SO–901, was used as the guide beginning on October 4, 1977. On October 3, 1979, the Commission ordered formal adoption of Plan 1977 as the rule for regulation of Lake Superior water levels. On the same date it amended the 1914 Orders of Approval in several respects. The Orders now specifically allow the Board to take the lower Great Lakes' water levels into account when setting outflows from Lake Superior. This amendment was in accord with the recommendations resulting from a decade-long study by the Commission of the future regulation of the Great Lakes. *See* International Joint Commission, *Further Regulation of the Great Lakes* (1976). Plan 1977 and the amended orders probably will result in higher monthly means, but they continue to stress that the lake level remain below 602.0 feet.

The individual plaintiffs are landowners on the Lake Superior shoreline. They claim that the increased water levels in Lake Superior have inundated their property and caused erosion and other damage to the shoreline and lake. Several organizations have joined as plaintiffs, alleging harm from the high water to their property, business or environmental interests. The defendants are the Secretary of the Army, the Chief of Engineers of the Corps of Engineers, and the Division Engineer of the North Central Division of the Corps of Engineers, who is the United States member on the Lake Superior Board of Control.

Plaintiffs filed their original complaint on April 1, 1974. Amended complaints were filed on December 22, 1975; June 16, 1978; and July 24, 1978. The gist of plaintiffs' claims is that the change in regulation of Lake Superior outflows which resulted in higher water levels was improper and illegal. They argue that use of plan SO–901 was contrary to the 1914 Orders of Approval. It is alleged that the defendants were without authorization under United States law to implement SO–901 and that their actions in doing so were ultra vires, and violated plaintiffs' Fifth Amendment right to compensation before their property is taken. In addition, defendants are said to have violated the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq.; and the National Historic Preservation Act, 16 U.S.C. §§ 470, et seq. Plaintiffs requested injunctive relief to prevent regulation of the lake based on SO–901 or plans like it, and a declaration that defendants' conduct constituted a taking of plaintiffs' property for public purposes without compensation.

On July 21, 1978, the defendants moved for summary judgment on several grounds. On August 8, 1978, plaintiffs made a cross motion for summary judgment. In their memorandum supporting the motion for summary judgment, the plaintiffs asked for an injunction preventing implementation of the new regulation plan "until the International Joint Commission officially issues other Orders of Approval supplanting or modifying the 1914 Orders of Approval." Because the October 3, 1979, action of the Commission allows regulation of Lake Superior with consideration of other Great Lakes' levels, the Court believes that plaintiffs' request for future injunctive relief is now moot. However, in the interest of fairness to the parties and because of possible future proceedings, the Court will ex-

plain why it believes plaintiffs would not be entitled to relief even if the request for an injunction had not been mooted.

■ The actions taken in changing the outflow from Lake Superior were actions taken under the International Joint Commission's authority and direction. By signing the Treaty of 1909, the United States gave up any control over the diversion, obstruction and use of boundary waters. Therefore, the increased water level in Lake Superior is not attributable to the United States. *Edison Sault Electric Co. v. United States*, 552 F.2d 326, 333 (Ct.Cl. 1977). Although the United States is not a defendant here, its lack of responsibility for the complained-of actions is important because plaintiffs' Fifth Amendment rights protect them only against governmental action.[3] Similarly, any actions by the named defendants were undertaken as agents or representatives of the International Joint Commission and the Lake Superior Board of Control, not as employees of the United States. *Id.* at 334. Therefore, the United States is not responsible for their conduct as it relates to the regulation of Lake Superior.

■ The fact that the regulation of Lake Superior is conduct attributable to the International Joint Commission, not the United States, is important for at least two other reasons. First, the Commission and its employees or representatives are immune from suit under 22 U.S.C. §§ 288a(b), 288d(b). *Edison Sault Electric Co. v. United States, supra,* at 336. *See* Restatement (Second) of Foreign Relations § 85 (1965). The immunity is provided for "acts performed by them in their official capacities and falling within their function as such representatives, officials or employees." The Division Engineer, North Central Division of the Corps of Engineers would appear to be immune for the actions he took as a member of the Lake Superior Board of Control.

---

**3.** It is difficult to understand the reasoning in *Miller v. United States, supra,* at 865 fn. 23, that the United States may be liable for operating projects in conformance with International Joint Commission directions, even though the United States is not responsible for those di-

rections. Under the treaty, the United States has no choice but to follow Commission orders; this country retains no independent authority in regard to those matters over which the Commission is given jurisdiction, i. e., the diversion and use of boundary waters.

■ Second, questions regarding the Commission's regulation of the boundary waters under the Treaty of 1909 may not be appropriate for judicial resolution. These questions contain issues of foreign relations, for which the Constitution gives Congress and the Executive primary responsibility. *See Miller v. United States*, 583 F.2d 857, 868 (6th Cir. 1978); *Dole v. Carter*, 569 F.2d 1109, 1110 (10th Cir. 1977); *Holmes v. Laird*, 148 U.S.App.D.C. 187, 191, 459 F.2d 1211, 1215 (D.C.Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Canadian Transport Co. v. United States*, 430 F.Supp. 1168, 1172 (D.D.C.1977). *See also Baker v. Carr*, 369 U.S. 186, 210–17, 82 S.Ct. 691, 706–10, 7 L.Ed.2d 663 (1961).

If this Court were to order defendants to change the manner in which they regulate Lake Superior, the effect would be felt not only on the American shore, but also on the Canadian side, and on the lower Great Lakes. The potential for conflict and multiple decisions is obvious. First of all, the United States physically controls only half of the outflow gates for Lake Superior. If discharge were increased through these gates, the International Joint Commission might order that the Canadian-controlled gates decrease outflow, so that the level of the lake would remain the same, or the Canadian government might take such action on its own. Furthermore, owners of shoreline property on the lower lakes would undoubtedly be upset by the higher levels that would be caused by increased Superior discharge. If they went into American or Canadian courts seeking injunctive relief, a truly confusing situation would result. It is clearly preferable to leave resolution of this problem with the Commission, where the Treaty of 1909 places it.

Plaintiffs allege that defendants' actions in following SO–901 and Plan 1977 are unauthorized and ultra vires. The basis for this argument is that these plans regulate Superior's level in conjunction with the levels of the lower lakes. Plaintiffs argue that Lake Superior interests alone may be considered in setting outflows. The only language that supports this contention is that quoted earlier for Paragraph 6 of the 1914 Orders of Approval—"levels . . . may be regulated so as to . . . reasonably protect the property and interests . . . above said works." However, this paragraph is found in the section of the Orders which gives the Commission's *findings* as to the effect of the proposed works. It imposes no duties with regard to the actual regulation of the lake level.

Those duties are found in the Conditions As To Control And Operation, Condition 5, also quoted above. There are two responsibilities of the Board of Control: keep the lake as nearly as may be between 600.5 and 602.0 feet; and don't allow the lake level to interfere with navigation. The lake level did not go above 602.0 feet. Even if it had, the "as nearly as may be" language would appear to be designed to allow variance in emergency situations, which this clearly was. Condition 8 sets the only other limit on water level regulation. It states that "the rules formulated by said board, when tested by the physical conditions which existed during any year of recorded high water in Lake Superior, when the monthly mean elevation of the lake exceeded 602.0, shall give no monthly mean level of the lake greater than the maximum monthly mean actually experienced in said year." Both SO–901 and Plan 1977 meet this condition, because they both keep the water level below 602.0 feet.

■ The Court concludes that even before the recent amendment of the Orders of Approval, the Commission and Board's actions were not unauthorized or ultra vires.[4] This result implements the overall purpose of the 1909 Treaty and the International Joint Commission—to regulate *all* the Boundary Waters. When a particular set of Orders of Approval does not specifically prohibit consideration of the effects of a

---

4. There can be no complaints about the procedures the Commission used in changing the regulation plan. Its Rules of Procedure, 22 C.F.R. § 401 (1979), allow the Commission to adopt the procedures necessary for it to carry out the Treaty mandate. *Id.* at §§ 401.9, 401.-10; *Edison Sault Electric Co. v. United States, supra*, at 336–37.

particular regulation plan on other lakes or boundary waters, the Commission should be free to manage the waters as a whole.

Plaintiffs also claim that there has been a taking of their property in violation of the Fifth Amendment. The Court is in full agreement with plaintiffs that a treaty may not violate the constitutional rights of American citizens. *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 100 L.Ed. 1148 (1957); *Holmes v. Laird, supra*, 148 U.S. App.D.C. at 193, 459 F.2d at 1217; Restatement (Second) of Foreign Relations § 117(1)(b). If the Treaty of 1909 did in some way effect a taking of plaintiffs' property, they would have a much stronger case for the necessity of finding a way to grant them relief. However, no taking has occurred here.[5]

As noted in the 1914 Orders of Approval, Lake Superior had a historical fluctuation of 3.5 feet. Under International Joint Commission regulation this range has been greatly reduced. Were it not for the Commission's management the lake would several times have been over 602.0 feet, and would have been much higher during the 1970's. In fact, levels as high or higher than those plaintiffs now complain of have been recorded fairly recently, in 1943–44 and in 1950–52.

A relatively short-term property owner may not be aware of historical patterns and is therefore more upset over level changes. The experience of plaintiffs Soucheray is illustrative. They purchased their property in July of 1961. At that time there was a distance of forty feet from their house to the water line. The monthly mean water level chart discloses that in July 1961 the lake was at or below 600.5 feet, a very low level and one which exposed more shoreline. When the water rose in the 1970's, only six feet separated the Soucheray residence and the lake. This seems like a great change, but if the land had been purchased in 1943 or 1951, the potential variation in water level would have been more apparent. It is

surely an unpleasant surprise to find one's property slowly being covered by water, but any shoreline owner must be aware that water levels can change. Absent International Joint Commission regulation, the degree of variation would be even greater. When, as here, the water level was kept below the 602.0 feet set in the 1914 Orders of Approval, there was clearly no taking. In addition, the remedy for taking of private property for public use is compensation to the owner, not injunctive relief against the taking.

Because the United States is not responsible for the actions taken in regulating the lake level, no relief is available on plaintiffs' statutory claims.

Therefore, IT IS ORDERED THAT:

1. Defendants' motion for summary judgment is granted.

2. Plaintiffs' motion for summary judgment is denied.

---

**5.** As stated earlier, it is extremely doubtful that a Fifth Amendment taking has occurred because no governmental action is involved.