## EROSION VICTIMS OF LAKE SUPERIOR REGULATION, etc., Plaintiffs,

### v.

## The UNITED STATES, Defendant.

### No. 327–86L.

United States Claims Court.

March 25, 1987.

J. Walter Brock, Muskegon, Mich., for plaintiffs.

Patricia N. Young, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiffs are a group of landowners who own property on the American shore of Lake Superior. They claim that the United States has taken their property through inverse condemnation in violation of the Fifth Amendment. Defendant has moved for dismissal.

### BACKGROUND [1]

The Great Lakes and their surrounding drainage area are one closely interrelated system. The total drainage area is 300,000 square miles, and the five Great Lakes, Superior, Huron, Michigan, Erie, and Ontario, cover 95,000 square miles. In an average year the system pours out over fifty cubic miles of water through the St. Lawrence River. Under the Boundary Waters Treaty of 1909, Jan. 11, 1909, United States-United Kingdom, 36 Stat. 2448, T.S. No. 548, the United States and Canada established the International Joint Commission ("IJC"), composed of 3 members from each country, to study and monitor the levels of boundary waters and to settle all related disputes. *See* 22 U.S.C. §§ 267b, 268 (1982).

The IJC has asserted physical control over the waters of the Great Lakes by manipulating the hydroelectric power gates on the St. Mary's River between Lake Superior and Lake Huron, and a series of locks and dams on the St. Lawrence River below Lake Ontario. The gates on the St. Mary's River, which are part of the Edison Sault Power Canal, help maintain Lake Superior's water level by restricting outflow

---

1. The background facts are contained in the complaint and in materials submitted in opposition to the motion to dismiss. For purposes of ruling on the motion they will be taken as true.

which escapes through the canal. The actual supervision of the operation of all control works, canals, headgates and bypasses for the lake is accomplished by the International Lake Superior Board of Control ("LSBC"), an entity established for that purpose by the IJC.

Lake Superior is the uppermost of the Great Lakes. Most of the Michigan shoreline of two of the lower Great Lakes, Michigan and Huron, is highly developed. Cities stand on filled wetlands, and many homes sit on bluffs overlooking the lakes. In 1973, the lower Great Lakes rose to higher levels, causing extensive floods in Michigan. This was a result of record water supplies to all of the Great Lakes except Superior, exceeding anything previously recorded. At the special request of the Government of the United States, and the expressed concern of the Government of Canada, the IJC undertook to modify the method of regulation of Lake Superior in view of these unprecedented conditions. It commenced to set outflows designed to provide relief for the lower Great Lakes while hopefully maintaining satisfactory conditions on Lake Superior. In its petition, the United States stated that it would deal with subsequent claims for losses. The IJC responded immediately, ordering the LSBC to close the power gates of Sault Edison Electric Company, thereby causing the level of Lake Superior to rise. The actual manipulation of the gates was done by Edison Sault employees, acting under the direction of a member of the U.S. Army Corps of Engineers ("Corps of Engineers"), an on-site representative of the LSBC.

Plaintiffs contend that the combined effects of the elevated levels and wave action have eroded substantial portions of their lakefront property. The complaint specifically alleges that the landowners' property has been "eroded and/or flooded by waters of Lake Superior due to the actions of the United States, acting through the International Joint Commission, which was created by a treaty between the United States and Canada." It goes on to state that defendant, "through the International Joint Commission, has, from 1972 to the present, directed the closing of hydroelectric gates belonging to Edison Sault Electric Company and located in the St. Mary's River, thereby raising the level of Lake Superior above its natural level." It concludes by alleging that the *"actions of the International Joint Commission* were useless, careless and negligent." (Emphasis added.) Plaintiffs attempt in their brief to connect defendant to these actions by arguing two theories: first, that the United States was an affirmative actor in making the request to impound more water in Lake Superior, and second, that the IJC was acting as an alter ego for defendant.

The United States has moved for dismissal, arguing that: 1) plaintiffs have not stated a claim against the United States; 2) the IJC is an indispensable party that cannot be joined; 3) this court lacks jurisdiction of these claims because of 28 U.S.C. § 1502 (1983); and 4) the claims are barred by the statute of limitations.

## DISCUSSION

The IJC is an independent, public, legal personality regarding questions within its scope of duty. Along with other such international organizations it is granted certain privileges and immunities, including immunity from suit and all forms of judicial process. 22 U.S.C. § 288a(b). Since the IJC is not and cannot be a defendant here, the primary issue is whether the action of closing the Edison Sault power gates is attributable in any way to the United States.

The decisions in two earlier cases are dispositive of plaintiffs' claim. In *Edison Sault Electric Company v. United States*, 213 Ct.Cl. 309, 552 F.2d 326 (1977), plaintiff sued the United States in our predecessor court to recover damages for a reduction in waterflow to its hydroelectric plants, alleging basically the same background circumstances which precipitate this action. As here it was alleged that unusually high water levels in the lower Great Lakes prompted the United States to make an emergency application to the IJC to reduce Lake Superior outflows. The IJC granted

the application and thereby reduced the waterflow to plaintiff's hydroelectric plant.

The power company attempted to establish that the reduction was an act of the United States on three bases, the first two of which are directly relevant here: 1) that the United States applied to the IJC for a reduction; 2) an employee of the United States actually ordered the flow reduction; and 3) since the IJC lacked jurisdiction over plaintiff there, as a matter of law the only responsible entity was the United States. The court addressed and rejected those contentions and granted summary judgment for defendant, concluding that the IJC's actions could not be attributed to the United States.

The court in *Edison* pointed out that "[f]or the United States to be liable for the acts of a third party, the third party must ... be an agency or instrumentality of the United States acting within the scope of its authority...." 213 Ct.Cl. at 315, 552 F.2d at 333 (quoting *Rose Marie Porter v. United States*, 204 Ct.Cl. 355, 496 F.2d 583 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975)). The court noted that the regulation of the elevation of Lake Superior and the outflow of the St. Mary's River was "clearly in the hands of the I.J.C." *Edison*, 213 Ct.Cl. at 315, 552 F.2d at 329. The mere fact that the United States petitioned the IJC to act did not establish agency. "The IJC is a sovereign body which was free to reject the application of the U.S. if it had so decided.... the Government does not become a principal to an action by suggesting that action to a third party, so long as that third party is free to reject the Government's suggestion." *Id.* at 322, 552 F.2d at 333. *See also, Best v. United States*, 154 Ct.Cl. 827, 292 F.2d 274 (1961); *Anglo-American Trading Corp. v. United States*, 109 Ct.Cl. 859 (1948).

The court likewise rejected the argument that the Government should be liable because one of the persons involved in executing the IJC directive was an employee of the Corps of Engineers:

[W]hen Colonel Snoke and other employees of the Corps of Engineers ordered plaintiff to reduce the water outflow, they acted as representatives of the Board in implementing the order of the IJC and not as employees of the defendant.

213 Ct.Cl. at 322; 552 F.2d at 333–34.

Plaintiffs assert that the holding of *Edison* is not binding here because that action was for breach of contract, and thus has "absolutely no legal significance with regard to the present case." Plaintiffs' Brief at 8. The opinion in *Edison* constitutes a dual holding. In the first part the court concludes that even if the elements of a breach of contract existed, since "the actions complained of by plaintiff were the acts of [the IJC], it follows that plaintiff may not recover for the damages occasioned by such actions." 213 Ct.Cl. at 326; 552 F.2d at 336. The second and independent holding is that, assuming the action was taken by the United States, there still would be no breach of contract. The fact that the court went on to give a second basis for its decision in no way undercuts the effect of its first holding, which this court finds to be directly controlling here.

To like effect is *Soucheray v. Corps of Engineers*, 483 F.Supp. 352 (W.D.Wisc. 1979). Plaintiffs there were landowners along the shore of Lake Superior who complained, as plaintiffs here do, that elevated levels of Lake Superior caused severe erosion damage to their property. The factual background of the complaint is the same as here, except that the defendant is different.

The court initially found that the actions taken by the IJC to reduce the flow from Lake Superior were within its scope of duty under the Boundary Waters Treaty, which the court concluded vested in the IJC the power to regulate all American-Canadian boundary waters. It pointed specifically to Article IV which states that any regulation which may raise the natural level of the Great Lakes must be approved by the IJC. By signing the treaty with Canada, "[t]he United States gave up any control over the diversion, obstruction and use of boundary waters, ... therefore the increased water level in Lake Superior is not attributable to the United States." 483 F.Supp. at 355.

Since the IJC's actions could not be charged to defendant, and since the IJC was immune from suit, the court granted the government's motion for summary judgment. It concluded, "[i]f [plaintiffs] went into American or Canadian courts seeking injunctive relief, a truly confusing situation would result. It is clearly preferable to leave resolution of this problem with the Commission, where the Treaty of 1909 places it." *Id.* at 356.

Plaintiffs argue that *Soucheray* is inapplicable because the United States was not a party in that case. While that is literally correct, they overlook the fact that the Chief Engineer of the Corps of Engineers was a defendant, as was the Secretary of the Army. In any event, *Soucheray* is unquestionably relevant with respect to its determination that the IJC is solely responsible for management of the levels of Great Lakes.

Plaintiffs argue that the decision of the Sixth Circuit Court of Appeals in *Miller v. United States*, 583 F.2d 857 (6th Cir.1978), is more closely on point. There the court addressed a taking claim brought by Lake Huron landowners against the United States pursuant to Article VIII of the Boundary Waters Treaty. The property owners complained that water levels in Lake Huron were kept artificially high by the operation of certain locks and dams, some on the St. Mary's River below Lake Superior. They advanced basically three theories of liability: first, that indemnification provisions of the treaty create a private right of action against the United States; second, that the Government had taken their property through construction and operation of canals and control works at the outlet of Lake Superior in violation of the Fifth Amendment; and third, that they could recover under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674.

The appellate court initially held that the treaty did not create a private remedy against defendant. "There is no indication that the treaty also expresses an intent on the part of the government to accept new obligations vis-a-vis its own citizens." *Id.* at 861. With respect to remaining issues, however,[2] the case was remanded to district court for a determination of whether the United States, in operating or constructing unspecified "government projects" took plaintiffs' land. 583 F.2d at 865. The court acknowledged that the IJC and LSBC were international bodies, not agents of the United States, but found that this fact could not insulate defendant from potential liability.

The court makes three observations about this latter analysis in *Miller*. First, it is not fully consistent with *Edison*, which held that the actions of Corps of Engineers personnel in compliance with IJC directives could not be attributed to the United States. *Edison* is binding on this court. *Miller* is not. Second, the facts of this case, as alleged by plaintiffs, are not within the possible exception *Miller* discusses. There is no allegation that the defendant operates "government projects" which have caused the flooding. Rather, the specific projects in question are those of a private entity, Edison Sault Power Company. Finally, the court agrees with the following comment in *Soucheray*, 483 F.Supp. at 355, n. 3:

> It is difficult to understand the reasoning in *Miller v. United States*, ... that the United States may be liable for operating projects in conformance with International Joint Commission directions, even though the United States is not responsible for those directions. Under the treaty, the United States has no choice but to follow Commission orders; this country retains no independent authority in regard to those matters over which the Commission is given jurisdiction, i.e., the diversion and use of boundary waters.

The court concludes that *Miller* does not support plaintiffs' argument.

---

**2.** The court also permitted plaintiffs' tort claim to remain. This court has no jurisdiction over tort claims. 28 U.S.C. § 1491(a)(1) (1982). Upon remand, the trial court in *Miller v. United States*, 480 F.Supp. 612 (E.D.Mich.1979) found that plaintiffs failed to demonstrate that any damage to their property was the result of actions of the United States or its agents.

## CONCLUSION

The inescapable conclusion to be drawn from the treaty, *Edison,* and *Soucheray,* is that the only relevant actor is the IJC, and that its actions, even when done in response to defendant's request, are not attributable to the United States. Defendant therefore cannot be held liable for the alleged taking of plaintiffs' property resulting from decisions of the IJC which lead to elevated water levels in Lake Superior. Plaintiffs have failed to state a claim against the United States.[3]

The court is sympathetic with the very real problems plaintiffs face. Nevertheless, that circumstance does not give this court authority to intervene. The court observes, however, that issues respecting compensation for any alleged damage or taking are best addressed by Congress, an entity better situated to weigh competing private, international, and state interests, and to undertake a more comprehensive remunerative and regulatory scheme in conjunction with Canada and the IJC.

Accordingly, the clerk is directed to dismiss plaintiffs' complaint with prejudice, and enter judgment in favor of defendant. Each party to bear its own costs.

---

**3.** The court therefore need not address defendant's other arguments. The court notes, however, that defendant correctly points out that under 28 U.S.C. § 1502 (1982), this court may not review claims growing out of treaties entered into with foreign nations. Article VIII of the Boundary Waters Act assigns to the Com- mission the power to maintain jurisdiction over, and to pass upon all cases involving boundary waters. An interpretation of these powers to act would undoubtedly require the court to review the terms of the treaty, in violation of § 1502. *See United States v. Weld,* 127 U.S. 51, 8 S.Ct. 1000, 32 L.Ed. 62 (1888).