Allan C. MILLER and Betty G. Miller,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 76–1694.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1977.

Decided Aug. 31, 1978.

Allan C. Miller, Betty G. Miller, Tawas City, Mich., for plaintiffs-appellants.

James K. Robinson, U. S. Atty., Detroit, Mich., Edward J. Shawaker, Carl Strass, Raymond N. Zagone, Appellate Sect., Land and Natural Resources Division, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before WEICK and MERRITT, Circuit Judges, and PECK, Senior Circuit Judge.

MERRITT, Circuit Judge.

Rivers and lakes mark more than half of the 3,500 mile border between Canada and the United States, and over the years many problems have arisen concerning the use and diversion of these waters and their tributaries for irrigation, navigation, flood control and electric power. In this case Allan and Betty Miller, owners of lakefront property on Lake Huron near Saginaw Bay, claim that the combined effect of two hydroelectric dams in Canada, and the operation of locks and flood gates at the outlet of Lake Superior near Sault Ste. Marie, have caused high water in the lower lakes. They claim that the United States supported construction of the Canadian dams and that the United States Corps of Engineers operates the locks and flood gates at Sault Ste. Marie in conjunction with an international

commission. They seek damages from the United States for alleged flooding and erosion caused by rising water levels and an increased flow of water in Lake Huron. The District Court dismissed their complaint, 410 F.Supp. 425 (E.D.Mich.1976), and they appeal. We affirm in part and reverse in part for fact-finding on specific questions.

## I. STATEMENT OF THE CASE

Specifically, the Millers say that the dams and the operation of the locks and flood gates have made the low water levels of Lake Huron higher, that the lake levels have varied up to 4.4 feet since 1965, and that the process of erosion has been aggravated by disruption of the littoral drift, by the destruction of protective beach barriers, and by the action of fall winds on the increased volumes of water. They said at oral argument that they had lost approximately 6,000 square feet of their lakefront lot since 1968 and that as a result their residence is now much closer to the lake.

The Millers claim that the diversion of two rivers in northern Ontario (the Kenogami River at Long Lac and the Ogoki River) has artificially increased the amount of water flowing into Lake Superior and that the release of water from Lake Superior into Lake Huron at Sault Ste. Marie has in turn raised the levels and increased the velocity of water in Lake Huron.

The Millers allege that the United States, "acting in concert with Canada . . . erected diversion dams at Long Lac and Ogoki, which reversed the [northerly] flow of these streams" from Hudson Bay into the Lake Superior watershed. The diversions are shown on the map of the Great Lakes region printed as Exhibit A in the Appendix. They claim that these Canadian dams divert from 5,000 to 10,000 cubic feet of water per second into Lake Superior and

that the United States Army Corps of Engineers, in concert with the International Joint Commission of the United States and Canada (the "IJC"), then "dumps" all of the water into the lower lakes, through locks and floodgates at Sault Ste. Marie, thereby maintaining Lake Superior at an "unnaturally" low level. We take judicial notice that it was the Hydroelectric Power Commission of Ontario which erected the dams and diverted the waters of the two Canadian rivers. It did so with the approval of the Province of Ontario and the approval of the Canadian Government and with the consent of the United States, as expressed by an executive agreement consisting of an exchange of notes between Secretary of State Cordell Hull and the Canadian Foreign Minister in October and November of 1940.[1]

The Millers have stated three theories of recovery against the United States. First, they claim that the indemnification provisions in the Boundary Waters Treaty of 1909 between the United States and Canada[2] create a basis for recovery against the United States for actions affecting boundary waters. Second, they claim that the United States has "taken" their property through construction and operation of canals and control works at the outlet of Lake Superior, and that compensation must be paid under the Fifth Amendment to the Constitution and the Tucker Act.[3] Finally, they claim damages under the Federal Tort Claims Act,[4] alleging negligent operation of the canal locks and control gates by the Corps of Engineers at Sault Ste. Marie.

## II. THE BOUNDARY WATERS TREATY OF 1909

The District Court correctly dismissed the Miller's claim under the 1909 treaty. The treaty does not create addi-

---

1. 54 Stat. 2426, E.A.S. No. 187. The notes are reprinted as Exhibit B in the Appendix found at the end of this opinion. For later discussions of the Long Lac-Ogoki diversions between the United States and Canada, see 3 Whiteman, Digest of International Law 772, 805–12, 860–64 (1964).

2. 36 Stat. 2448, T.S. No. 548.

3. 28 U.S.C. § 1346(a)(2).

4. 28 U.S.C. §§ 1346(b), 2674.

tional private rights of action for a United States citizen against his own government. The Ogoki and Long Lac diversions, moreover, are not within the subject matter governed by the treaty nor are they within the jurisdiction of the IJC, the international monitoring agency created by the treaty.[5]

The purpose of the Boundary Waters Treaty of 1909 was "to prevent disputes regarding the use of boundary waters" and "to make provision for the adjustment and settlement" of questions "between the United States and the Dominion of Canada involving the rights, obligations, or interests of either in relation to the other or to the inhabitants of the other." To this end, the treaty establishes the IJC, which performs certain judicial, investigative, administrative and engineering functions. It has the authority to approve or prohibit and to regulate the obstruction or diversion of certain waters, and the United States and Canada agree not to allow construction of such projects without IJC approval. (Articles III, IV, VIII).

The Millers claim a right of action under one paragraph of Article VIII of the treaty which allows the IJC to insist on compensation of citizens in certain situations "as a condition of its approval" of a project. Article VIII, however, limits the scope of the compensation requirement to citizens "on the other side of the line" from the project in question. The pertinent paragraph of Article VIII provides:

In cases involving the elevation of the natural level of waters *on either side of the line* as a result of the construction or maintenance *on the other side* of remedial or protective works or dams or other obstructions in boundary waters or in waters flowing therefrom or in waters below the boundary in rivers flowing across the boundary, the Commission shall require, as a condition of its approval thereof, that suitable and adequate

provision, approved by it, be made for the protection and *indemnity of all interests on the other side of the line* which may be injured thereby. [Emphasis added.]

For example, if Canada proposes construction of a dam in certain Canadian waters, the United States and Canada agree under Article VIII that the IJC will not approve unless Americans injured by the dam are indemnified. Under Articles III and IV, moreover, the Canadian government has promised that it will not allow construction of such a dam without IJC approval. Canada breaks its treaty obligations to the United States if it permits construction before the IJC approves. We emphasize, however, that the only *treaty-made* obligations which are broken are those of Canada to the United States. Certainly the United States, even if it fails to make diplomatic representations or actively encourages the dam construction in Canada, has violated no treaty-created obligations to its own citizens.

Conversely, if the United States allows someone to build a dam in the specified American waters without IJC approval, and Canadians are injured as a consequence, the United States has violated its treaty obligations to Canada under Articles III, IV, and VIII. The United States has not, however, violated any treaty-made obligations to its own citizens, even if Americans as well as Canadians have been injured by the project.[6]

Thus we see that disputes between the Millers and their own government have no place in the treaty context of Article VIII. The United States and Canada each have agreed to take responsibility for international effects of certain domestic actions. The Millers, however, clearly do not request "trans-boundary" indemnification arrangements with Canada, but rather seek damages from their own government. We un-

---

**5.** In addressing the various issues under the treaty, we commend the United States for a helpful and thorough supplemental brief.

**6.** Apart from IJC project approval under Article VIII, the treaty creates no enforcement

mechanism for Articles III and IV which could conceivably create a private cause of action. *See Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493, 506–07, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971) (Douglas, J., dissenting).

derstand the treaty and the establishment of the IJC to be a means of providing for peaceful adjustment of interests between the United States and Canadian governments as representatives of their citizens. The two countries in signing the treaty agreed to accept responsibility for the international repercussions of domestic water control projects, but there is no indication that the treaty also expresses an intent on the part of either government to accept new obligations vis-a-vis its own citizens.

The same principles apply to the other indemnity provision of the treaty on which the Millers rely. Article II provides that a government or person engaged in "interference with or diversion" of certain waters will have the same obligation to compensate injured citizens "on the other side of the boundary" as it has to compensate local citizens:

> [A]ny interference with or diversion from their natural channel of [waters which in their natural channels would flow across the boundary or into boundary waters] on *either side* of the boundary, resulting in any injury *on the other side* of the boundary, shall give rise to the same rights and entitle the injured parties to the same legal remedies as if such injury took place in the country 'where such diversion or interference occurs. . . . [Emphasis added.]

This compensation provision leaves the citizen to pursue his rights against his own government under domestic law. It does, however, require a government to give to injured persons "on the other side of the line" the same rights as it gives its own citizens if a particular project has transboundary effects.[7]

■ A second reason for our decision is that the Ogoki and Long Lac diversions do not appear to be covered by the treaty or to fall within the jurisdiction of the IJC. Indeed, neither the two governments nor the Hydroelectric Power Commission of Ontario applied to the IJC for permission to reverse the waters of the two rivers into Lake Superior because the IJC does not have jurisdiction over these waters. The treaty does not identify by name the lakes and streams which fall within the terms of the treaty or within the jurisdiction of the IJC. Rather, Articles III, IV and VIII give the IJC jurisdiction of boundary waters and waters flowing from boundary waters and waters below the boundary in rivers that flow across the boundary. The IJC does not, however, have jurisdiction over higher waters flowing into boundary waters.[8] The Long Lac-Ogoki diversions fall in this category.

Article II, which is not related to the IJC's jurisdiction, does refer to waters above the boundary. As discussed above, it requires equal governmental treatment of people on the other side of the line injured by obstruction or diversion of higher waters flowing across the boundary or into boundary waters, but only if the higher waters flow there within their "natural channels." The waters from the two Canadian rivers do flow into Lake Superior, but not within their natural channels. We conclude that even if the treaty gave American citizens some private rights against their own government, it would nevertheless have no application to damage caused by the Long Lac and Ogoki diversions.

## III. TAKING OF PROPERTY

The second count of the Millers' complaint alleges that the United States has taken property for public purposes by releasing waters from Lake Superior through locks and control dam gates, and that the

---

7. This interpretation of Article II is supported by a State Department memorandum *printed in* Sen. Doc. No. 118, 85th Cong., 2d Sess. (1958) at 46–48; Note No. 1250 from Huntington Wilson to James Bryce (Aug. 22, 1911) (National Archives); *see also* 3 Whiteman, *Digest of International Law* 767–68 (1964).

8. "It appears from an examination of the terms of the treaty that no jurisdiction is conferred upon the International Joint Commission with reference to waters flowing across the boundary or which are tributary to boundary waters in distinction from boundary waters themselves. . . ." Note No. 1250 from Huntington Wilson to James Bryce (Aug. 22, 1911) (National Archives).

United States must pay compensation under the Fifth Amendment and the Tucker Act.

## A. The Indispensable Party Issue

■ The District Court dismissed this claim on the grounds that the Millers had failed to join as a defendant the State of Michigan. The District Court viewed Michigan as an indispensable party under Rule 19 of the Federal Rules of Civil Procedure, noting that the state holds title to lands beneath navigable waters under the Submerged Lands Act, 43 U.S.C. §§ 1301 *et seq. See United States v. Louisiana,* 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960).

The complaint makes clear that the Millers do not seek to hold Michigan responsible for the alleged taking of their property. A judgment for or against the United States would not bind Michigan or require the court to reach conclusions as to liability on the part of Michigan, since the Millers seek damages from the United States, not a return of property now owned by Michigan.[9] The title to lands beneath the waters of Lake Huron is not an issue in the litigation, and the remedy sought would not adversely affect Michigan interests. The Government agrees that the state is not an indispensable party. We hold that the absence of the State of Michigan as a party-defendant does not prevent the court from adequately addressing the Millers' claim without unfairly affecting Michigan interests.

**9.** *See, e.g.,* 3A Moore's Federal Practice § 19.-09[5] (2d Ed. 1977):

> Where an action is brought against a defendant for a wrongful transfer of real or personal property and relief can be fashioned which will not adversely affect the transferee's interest, as a judgment for damages against the defendant, the transferee need not be joined.

**10.** The relevant allegations are:

4. That the defendant acting through the Corps of Engineers after impounding the waters of Lake Superior and other waters diverted into it has released and is releasing said waters through the control dam gates, the Soo Locks and particularly the Poe Lock erected in 1968, into Lakes Michigan-Huron;

## B. The "Taking" Issue

The Government suggests that the Millers' Count II should nevertheless be dismissed for failure to state a claim for relief. It says that the Millers have not alleged facts which constitute a "taking" under the Fifth Amendment or an implied contract claim under the Tucker Act. As we interpret the complaint, the Millers allege that land above the ordinary high water mark ("uplands or fastlands") has become submerged and that the submerged land has been eroded by the flow of the water. The Millers further appear to allege that the flooding is not merely accidental or temporary but that part of their land which was formerly above the ordinary high water mark is now below the ordinary high water mark. It is apparent the Millers believe that the Government has physically invaded their property and that the proximate cause of the raised water levels and the submersion and erosion of their land is the release of water from Lake Superior through locks and control gates by employees of the United States.[10]

Historically, the conception of a "taking" under the Fifth Amendment has changed as social and economic values and prevailing ideologies have shifted. In a variety of ingenious ways, courts have narrowed the principle of "just compensation" in order to reduce the cost of economic development with the effect of subsidizing growth.

5. That by unnaturally increasing the water level in the lower lakes and the velocity of said flow, has taken by permanent erosion land theretofore owned as uplands or fastlands by plaintiffs along the shores of Lake Huron described above, and by causing said lands to become submerged became property of the United States as navigable waters; [sic]

If water is released which would have entered Lake Huron in any case, there has been, of course, no taking attributable to the construction or maintenance of the control works or canals. *See* note 20, *infra.* The Millers apparently seek to show that the structures themselves have somehow increased the volume or rate at which water can be released from Lake Superior (e. g., by widening the outlet) and that this is the real cause of the flooding.

The *Charles River Bridge* case [11] and court decisions interpreting the early nineteenth century Mill Acts "offer some of the earliest illustrations of American willingness to sacrifice the sanctity of private property in the interest of promoting economic development." [12] Later judicial decisions have reduced the cost of dam construction. For example, high water from a government dam reduces the operating head of a mill pond and damages the mill owner just as much when the mill is on a navigable stream as when it is on a non-navigable stream, but in *United States v. Willow River Power Co.* [13] the Court, distinguishing *United States v. Cress*, [14] held that because the Government holds a navigational servitude under the Commerce Clause, compensation to the mill owner is available only if he has chosen a non-navigable stream.

Similarly, the Government's dominant servitude has provided grounds for denying compensation when a navigation project causes erosion damage by changing the flow of the water without raising its level. The reason given is that landowners along the shore "have no vested rights in the flow of navigable waters as against the Government." [15]

Another way courts have limited the Government's liabilities under the Constitution is through the elaboration of a distinction between takings and "mere" torts. Flooding cases provide some examples. When the Government deliberately raises the water level by impounding water behind a dam, the permanent takeover of land by water is a taking. [16] Courts have seldom denied compensation, found the harm "indirect" or relied on Latin ("damnum absque injuria") in such a case. As Justice Jackson said in *Willow River*, 324 U.S. at 509, 65 S.Ct. at 767, "High-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid." In other cases, however, as when a landowner is damaged by release of water through a dam or a change in flooding patterns is caused by construction of levees, courts have frequently denied compensation, saying that the flooding involves at most a tort, not a taking or an implied contract claim. Often the reason is that the Government's action has only resulted in temporary rather than permanent or recurrent flooding. [17] Courts have also relied on the explanation that the loss is not a "direct" appropriation of land but merely a "consequential and incidental" result of the Government's actions. [18] As a part of such

11. *Charles River Bridge v. Warren Bridge*, 11 Pet. 420, 36 U.S. 420, 9 L.Ed. 773 (1837).

12. Horowitz, *The Transformation of American Law 1790–1860* at 47 (1977). *See also* Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165 (1967).

13. 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

14. 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917).

15. *Pitman v. United States*, 457 F.2d 975, 977, 198 Ct.Cl. 82 (1972). This rationale does not apply, however, when erosion is caused by a rise in the water above the ordinary high water mark rather than by a change in the flow. *United States v. Dickinson*, 331 U.S. 745, 750–51, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947).

16. *See United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *United States v. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871).

17. Sometimes this issue is phrased by asking whether a servitude has been acquired: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947). "[I]t is, at least, necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property." *Sanguinetti v. United States*, 264 U.S. 146, 149, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924).

18. *Danforth v. United States*, 308 U.S. 271, 275, 60 S.Ct. 231, 84 L.Ed. 240 (1939); *Sanguinetti v. United States*, 264 U.S. 146, 149–50, 44 S.Ct. 264, 68 L.Ed. 608 (1924); *John Horstmann Co.*

an evaluation, important considerations are often whether the submersion of the land was intended or contemplated by the Government as a necessary part of its plans,[19] and whether similar although possibly less severe flooding would have occurred in any case.[20]

In considering whether the Millers' alleged loss is in the nature of a "taking," the court may take judicial notice of the recorded levels of Lakes Michigan-Huron during relevant periods.[21] The Millers claim that their initial damage occurred in 1968. Some of the lowest levels ever recorded in Lake Huron occurred in the immediately preceding years, as the water level chart printed in the Appendix as Exhibit C demonstrates. Over half the years of the preceding century saw water levels in Lake Huron which were higher than the highest level recorded in 1968. The property loss allegedly continued through 1975, the date of the Millers' amended complaint. While the levels recorded during the mid-1970's were relatively high, comparable and even higher levels persisted throughout most of the second half of the nineteenth century, before either the Long Lac-Ogoki works or the Lake Superior works had been built. During that period, levels up to a foot higher occurred. High water levels similar to those experienced by the Millers were also reached as recently as 1951–53. Even if the operation of the structures in question could be shown to have aggravated or prolonged flooding of the Miller property during a given period, the levels complained of are therefore well within the magnitude of long-range historical fluctuations in the levels of the lake, fluctuations apparently caused by variations in precipitation and other natural factors. In this context, it is difficult to imagine that the Millers can show a "direct appropriation" resulting from the United States locks and dams at the outlet of Lake Superior.

■ Nevertheless, the Millers appear to allege just such a "direct appropriation." They charge that the Government has physically occupied their property on a permanent basis, not merely altering the flow of water and causing erosion, but deliberately raising the "natural" level of Lake Huron above the ordinary high water mark. A citizen's right to "just compensation" for a "taking" of private property is a part of our Bill of Rights, and if the Millers can support their allegations with facts, they are entitled to compensation. The logical basis for their claim is, however, a factual question to be addressed by the trial court rather than by a court of appellate jurisdiction.[22] In order to give the Millers the fullest possible opportunity to explain the factual basis of a claim which is only vaguely sketched in their complaint, and because the assessment of whether damage is merely a "consequential or incidental" result of a government project necessarily turns on resolution of basic factual issues, the case will be remanded to the District Court.

■ On remand, the Millers in order to prevail will need to show not only that

v. *United States*, 257 U.S. 138, 145–46, 42 S.Ct. 58, 66 L.Ed. 171 (1921); *Jackson v. United States*, 230 U.S. 1, 23, 33 S.Ct. 1011, 57 L.Ed. 1363 (1913). This reasoning has also been used when erosion damage is caused by a change in flow rather than by a rise in water level. *Pitman v. United States*, 457 F.2d 975, 977, 198 Ct.Cl. 82 (1972).

19. *E. g., Sanguinetti v. United States*, 264 U.S. 146, 150, 44 S.Ct. 264, 68 L.Ed. 608 (1924); *John Horstmann Co. v. United States*, 257 U.S. 138, 146, 42 S.Ct. 58, 66 L.Ed. 171 (1921).

20. *Danforth v. United States*, 308 U.S. 271, 286, 60 S.Ct. 231, 84 L.Ed. 240 (1939); *Sanguinetti v. United States*, 264 U.S. 146, 149, 44 S.Ct. 264, 68 L.Ed. 608 (1924).

21. See generally, *American Transit Lines v. Smith*, 246 F.2d 86 (6th Cir.), cert. denied, 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 188 (1957); *Vestal v. Glen Falls Ins. Co.*, 146 F.Supp. 494 (E.D.N.C.), aff'd 244 F.2d 78 (4th Cir. 1957); *Clark v. United States*, 109 F.Supp. 213 (D.Or. 1952), aff'd 218 F.2d 446 (9th Cir. 1954).

22. For example, evidence that the net effect of artificial factors on the level of Lakes Huron-Michigan is to lower rather than raise the level, as suggested by the IJC in its publication, *Further Regulation of the Great Lakes* (1976) at 21, can only be assessed by the trial court.

man-made projects have caused the alleged property loss, but also that the United States is responsible. The locks and dams at the outlet of Lake Superior straddle an international boundary and were built in part by Canadians on the Canadian side. The treaty with Canada and the supervisory role of the IJC do not insulate the United States from constitutional liability when it carries out a government project in boundary waters,[23] but the United States can of course be held liable only for its own actions, not for those carried out independently by Canada.[24] Therefore, even if causation of the property loss can be shown, the District Court will also need to consider the scope of United States responsibility for the construction and operation of the works at the outlet of Lake Superior.

■ To the extent the Millers blame the Long Lac-Ogoki diversions, the principles discussed above also apply and appear to be dispositive. Although Count II of the complaint makes no specific mention of the Long Lac-Ogoki works, the Millers contended at oral argument that "joint action" by the United States and Canada to divert the Canadian streams, by increasing the amount of water flowing into the Great Lakes, is also a cause of the alleged taking. Even if the diversion of the two streams can be said to have directly caused the Millers' property loss, we do not see that the United States is in any sense responsible. The Millers appear to claim that the United States arranged for or supported construction of the works in international negotiations with Canada, but they do not allege that the United States owns or operates the works. Diplomatic notes exchanged by the two countries in 1940 show only that the United States conditioned its consent to withdrawal of water by Canada at Niagara Falls upon the operation of the Long Lac-Ogoki works by the Hydroelectric Power Commission of Ontario.[25] The United States Government clearly does not have any direct authority over the diversions. It does have the power to make diplomatic representations to Canada on behalf of American citizens such as the Millers, but failure to do so does not render the United States responsible for Canadian actions,[26] and moreover, the Government's decision about whether to pursue such international negotiations is a policy matter in the hands of the Executive Branch, not an issue which can be properly considered by a court.[27] In summary, as we understand the situation, the Long-Lac and Ogoki diversion dams have been constructed and are owned and operated by Canadians in Canada, and we can discern no governmental action for which the United States can be held liable under the Fifth Amendment.

---

**23.** The government has suggested that the United States may not be held liable for implementing orders of the IJC or its Lake Superior Board of Control. We agree that the IJC and its subsidiary boards are international bodies, not agents of the United States, even though the members of the commission and its boards include United States citizens and employees of the Corps of Engineers. *Edison Sault Elec. Co. v. United States*, 552 F.2d 326 (Ct.Cl.1977). However, the United States may not take land and avoid payment of compensation simply by arguing that a government project was carried out in accordance with an agreement with Canada and the orders of an international commission. In short, while the United States is not responsible for the formulation and issuance of IJC directives, it may be responsible for government projects which it constructs or operates in conformance with such directives.

**24.** See notes 26 and 27, *infra*, and accompanying text.

**25.** 54 Stat. 2426, E.A.S. No. 187.

**26.** *See Edison Sault Elec. Co. v. United States*, 552 F.2d 326, 333 (Ct.Cl.1977); *Anglo American Trading Corp. v. United States*, 75 F.Supp. 260 (Ct.Cl.1948). Cases involving the joint construction and ownership of a dam by two countries or the appropriation of land by the United States for transfer to another country, as in a boundary settlement, should be distinguished. *See, e. g., United States v. 85,237 Acres of Land*, 157 F.Supp. 150 (S.D.Tex.1957), aff'd sub nom. *Guerrero-Zapata Bridge Co. v. United States*, 252 F.2d 116 (5th Cir. 1958) (dam on Rio Grande); 22 U.S.C. § 277d–17(b) (Chamizal boundary settlement).

**27.** *Aris Gloves, Inc. v. United States*, 420 F.2d 1386, 190 Ct.Cl. 367 (1970); *Huther v. United States*, 145 F.Supp. 916, 136 Ct.Cl. 655 (1956); *Cross v. Pace*, 106 F.Supp. 484 (D.D.C.1952).

## IV. TORT CLAIM

The Millers further allege that the United States has tortiously damaged their property through negligent operation of the works at the outlet of Lake Superior and that the United States should be held liable under the terms of the Federal Tort Claims Act.[28] The District Court dismissed the claim on the grounds that the actions alleged were clearly "discretionary" rather than "operational," and consequently outside the scope of the Act.[29]

It is clear that in some instances a tort claim against the Government may be properly dismissed by the court without fact-finding on the grounds that the claim falls within the discretionary function exception as a matter of law.[30] In some cases, however, fact-finding on the nature of the acts complained of may be necessary before the court has an adequate basis to decide whether they are "discretionary."[31] The issue before us is whether the acts alleged are so clearly in the realm of policy-making that the court should sustain the Government's motion to dismiss without further investigation.[32]

█ The discretionary function exception does not insulate the Government from liability for all mistakes of judgment of its agents, but only for significant policy and political decisions, the types of governmental decisions which should not be circumscribed by customary tort standards. The word "discretion" in a statute is not used in a weak sense to mean "judgment" or "discernment" but rather in the strong sense to mean that an official has the "power of free decision"[33] and is not bound by tort standards set by another authority such as a court. In a republic it is often a perplexing task to distinguish those official risk-creat-

**28.** The Millers make the following statements about actions by United States employees:

  5. That in the spring and summer of 1968, 1969, and 1970, particularly, the said Corps of Engineers acting within the scope of their employment as aforesaid, suddenly and without warning released excessive quantities of water from the upper lake into the lower lakes; that said acts were due in part to: a. the careless estimates of the amount of water that could be safely dumped without injury to downlake riparian owners; b. utter disregard of the interests of downlake riparians; c. and without exercising reasonable care and skill required of one engaging in activities that involve likelihood of injury to others, here downstream riparians; all to the injury of plaintiffs.
  6. That despite the duty of releasing only such quantities that could be released without doing injury and to perform reasonably, said Corps of Engineers dumped 70,000 cubic feet per second of water through said 16 control gates and dumped even additional quantities through the new Poe Lock and the older locks and the power canals, including the Federal power plant canal; and particularly on 1 August 1968, defendants suddenly opened all the gates in utter disregard of the rights of plaintiffs to their injury . . . . 9. . . . a. That it was operational negligence to consider only the level of Lake Superior and not downstream levels in opening and closing said control gates. b. That it was operational negligence to consider only Lake Superior levels and ignoring even known rainfall in its watershed.

**29.** 28 U.S.C. § 2680(a) provides that the Government is not liable for "Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

**30.** See *Dalehite v. United States*, 346 U.S. 15, 34 n. 29, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) and cases cited therein; *Konecny v. United States*, 388 F.2d 59 (8th Cir. 1967).

**31.** E. g., *Guy F. Atkinson Co. v. Merritt, Chapman & Scott Corp.*, 126 F.Supp. 406, 409 (N.D. Cal.1954).

**32.** Our discussion is limited to the scope of the Federal Tort Claims Act. The Government incidentally suggests that liability for flooding is also precluded by 33 U.S.C. § 702c, which limits liability in connection with flood control projects. The issue apparently was not raised in the court below, however, and has not been briefed on appeal. Given the state of the record and the lack of analysis by the parties, we find no basis for addressing the issue at the present time.

**33.** *Webster's Third New International Dictionary of the English Language* (1966).

ing activities and decisions which should be governed by normal tort standards of reasonableness from those decisions for which public officials should be held accountable only to the Constitution or through the political process.

The Supreme Court stated in *Dalehite v. United States*, 346 U.S. 15, 36–37, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), "the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." In this regard, the Court cited with approval a number of District Court decisions involving claims of water damage. In *Lauterbach v. United States*,[34] the court rejected the plaintiffs' claim of damage due to the release of flood waters from a dam, based in part on the discretionary function exception as applied to the design and construction of the dam, and in part on a finding that there was in fact no negligence shown in its operation. In *Olson v. United States*,[35] the court granted a motion to dismiss plaintiff's claim that employees of the United States negligently opened the floodgates of a dam, destroying plaintiff's livestock; the court concluded that "*When* flood waters are to be released and *how much* water is to be released certainly calls for the exercise of judgment. . . . The Government's agents did not open the gate in the dam in a negligent manner. They merely abused their discretion as to *when* to open it." [36]

These cases must be carefully interpreted. The *Olson* decision in particular, as cited in *Dalehite*, should not be read to establish a rule-of-thumb exempting the United States from liability in all cases involving release of water through a dam or diversion of floodwaters.[37] For example, in *United States v. Hunsucker*, 314 F.2d 98 (9th Cir. 1962), the Ninth Circuit found that the diversion of waters from an Air Force base onto plaintiffs' land was "operational." In other cases the United States has also been found liable in tort for flooding due to the defective construction of a drainage ditch,[38] and due to inadequate maintenance of drainage facilities.[39]

█ This analysis leads us to the conclusion that the "discretionary function exception" does not immunize the government from liability for the manner in which its agents raise and lower the flood gates at Sault Ste. Marie, or for their mistakes in judging or measuring how much water is going through the gates, or for their failure to observe regulations governing their activities. The discretionary function exception does, however, insulate the government from tort liability for deliberate official decisions and directives requiring lake levels to be maintained within a specific range.

In applying these principles to the Millers' case, it must be remembered that the opening and closing of the dam gates in question are governed not merely by an administrative agency of the United States but by international agreement. The works at the outlet of Lake Superior are in boundary waters and fall within the terms of the Treaty of 1909. The treaty provides that the United States and Canada must obtain approval of the International Joint Commission before constructing obstructions in boundary waters (Articles III, VIII), and that the IJC can impose conditions on the grant of any approval. For the works in question here, the Orders of Approval established an International Lake Superior Board of Control to regulate the works and adjoining power canals. The stated objec-

**34.** 95 F.Supp. 479 (W.D.Wash.1951).

**35.** 93 F.Supp. 150 (D.N.D.1950).

**36.** 93 F.Supp. at 152–53. *See also North v. United States*, 94 F.Supp. 824 (D.Utah 1950).

**37.** *See Blessing v. United States*, 447 F.Supp. 1160, 1174–75 n. 21 (E.D.Pa.1978).

**38.** *Seaboard Coast Line R. R. v. United States*, 473 F.2d 714 (5th Cir. 1973).

**39.** *Valley Cattle Co. v. United States*, 258 F.Supp. 12 (D.Haw.1966).

tive of the Board under the Orders of Approval is to "maintain the level of Lake Superior as nearly as may be" within a specified range.[40] By its adherence to the Treaty of 1909, the United States has clearly agreed to abide by the conditions imposed by the IJC and hence by the regulatory programs of the Board.

■ To the extent the Millers attack the decision of the United States to adhere to and carry out the directives of the IJC and its Board, their claim must be rejected. Such a claim is closely intertwined with the conduct of United States foreign policy by the legislative and executive branches of government—an area in which courts are traditionally reluctant to interfere.[41] The notion of separation of powers and the idea that the policy decisions of the other branches of government must not be tested in tort suits in the courts underlies our further conclusion that the decision to carry out the regulatory programs of the Board is clearly "discretionary" rather than "operational." Acts by United States employees to implement the regulatory program as required would also appear to be acts "in the execution of a statute or regulation" which may not be challenged in a tort suit

under the terms of the exception. No matter how erroneous or unjustified the decisions of the Board may appear to be, the United States has bound itself, for foreign policy reasons, to adhere to those decisions until they are modified by the Board itself or the IJC.[42]

It is not clear from the complaint, however, whether the Millers go beyond an attack on the regulatory regime itself—a program which clearly dictates that operation of the dam gates be based on the current levels of water in Lake Superior—and further allege that employees of the United States have been negligent in the manner in which they have carried out a particular job or task. For consideration of this question alone, the claim of tort liability is remanded to the District Court.

Accordingly, the judgment of the District Court is affirmed with respect to the Millers' claim under the Boundary Waters Treaty of 1909 and reversed and remanded for further proceedings as outlined in Sections III and IV of this opinion with respect to the Millers' claims under the Fifth Amendment and the Federal Tort Claims Act.

---

**40.** Orders of Approval, May 26, 1914 and May 27, 1914, *printed in* International Joint Commission, Further Regulation of the Great Lakes (1976) at 79–82. For further discussion of the Board of Control and its regulatory programs, *see Edison Sault Elec. Co. v. United States,* 552 F.2d 326 (Ct.Cl.1977).

**41.** *See* note 27 *supra.*

**42.** *See Four Star Aviation, Inc. v. United States,* 409 F.2d 292 (5th Cir. 1969). As in the

preceding section on the constitutional claim, the IJC and its Board of Control are viewed here as independent, international bodies, not as agents of the United States. *See* note 23 *supra.* A challenge to the United States' decision to adhere to IJC directives should be distinguished for purposes of analysis from a direct challenge to an IJC or Board decision, a claim which would be barred by the International Organizations Immunity Act of December 29, 1945, 22 U.S.C. § 288a(b).

EXHIBIT A

[Source: International Joint Commission, Further Regulation of the Great Lakes (1976) at iv.]

GREAT LAKES BASIN

Figure 1

EXHIBIT B

[54 STAT. 2426-28]

<div style="margin-left:2em;">

October 14 and 31,
and November 7,
1940

[E. A. S. No. 187]

</div>

*Agreement between the United States of America and Canada respecting Great Lakes-St. Lawrence Waterway. Effected by exchanges of notes signed October 14 and 31 and November 7, 1940.*

*The Secretary of State to the Canadian Minister*

DEPARTMENT OF STATE
WASHINGTON
*October 14, 1940*

SIR:

I have the honor to refer to the conversations which have taken place recently between officials of the Governments of the United States and Canada in regard to the desirability of taking immediate steps looking to the early development of certain portions of the Great Lakes — St. Lawrence Basin project. These conversations have indicated that there is apprehension in both countries over the possibility of a power shortage; these apprehensions have been heightened by the necessity for increased supplies of power in consequence of Canada's war effort and of the major national defense effort in the United States.

**U.S. proposals.** In the light of these considerations the Government of the United States proposes that each Government appoint forthwith a Temporary Great Lakes — St. Lawrence Basin Committee consisting of not more than five members. These two Committees would cooperate in preliminary engineering and other investigations for that part of the project which is located in the International Rapids Section of the St. Lawrence River, in order that the entire project may be undertaken without delay when final decision is reached by the two Governments. **Advance of funds.** The Government of the United States is prepared to advance the necessary funds up to $1,000,000 to pay for these preliminary engineering and other investigations, on the understanding that their cost shall ultimately be prorated by agreement between the two Governments.

**Utilization of certain waters by Ontario.** Meanwhile, to assist in providing an adequate supply of power to meet Canadian defense needs and contingent

EXHIBIT B—Continued

upon the Province of Ontario's agreeing to provide immediately for diversions into the Great Lakes System of waters from the Albany River Basin which normally flow into Hudson Bay, the Government of the United States will interpose no objection, pending the conclusion of a final Great Lakes — St. Lawrence Basin agreement between the two countries, to the immediate utilization for power at Niagara Falls by the Province of Ontario of additional waters equivalent in quantity to the diversions into the Great Lakes Basin above referred to.

I shall be glad if you will let me know if your Government is in accord with the foregoing proposals.

Accept, Sir, the renewed assurances of my highest consideration.

For the Secretary of State:

ADOLF A. BERLE, Jr.

The Honorable
LORING C. CHRISTIE,
Minister of Canada.

————

The Canadian Minister to the Secretary of State

No. 316.

CANADIAN LEGATION
WASHINGTON
October 14, 1940.

SIR:

I have the honour to refer to your note of October 14, in which you proposed that the Governments of Canada and the United States take immediate steps looking to the early development of certain portions of the Great Lakes — St. Lawrence Basin project.

Agreement by Canada.

I am instructed to inform you that the Canadian Government is in accord with the proposals which you have made.

I have the honour to be, with the highest consideration, Sir,

Your most obedient, humble servant,

LORING C. CHRISTIE

The Honourable CORDELL HULL,
Secretary of State of the United States,
Washington, D.C.

EXHIBIT B—Continued

*The Canadian Minister to the Secretary of State*

No. 340                              CANADIAN LEGATION
                                              WASHINGTON
                                     *October 31, 1940.*

SIR:

I have the honour to refer to the third paragraph of your note of October 14, concerning the Great Lakes — St. Lawrence Basin project, in which you state that to assist in providing an adequate supply of power to meet Canadian defence needs and contingent upon the Province of Ontario's agreeing to provide immediately for diversions into the Great Lakes System of waters from the Albany River Basin which normally flow into Hudson Bay, the Government of the United States would interpose no objection, pending the conclusion of a final Great Lakes — St. Lawrence Basin agreement between the two countries, to the immediate utilization for power at Niagara Falls by the Province of Ontario of additional waters equivalent in quantity to the diversions into the Great Lakes Basin above referred to.

I am instructed to inform you that the Canadian Government has received appropriate assurances that the Hydro-Electric Power Commission of Ontario is prepared to proceed immediately with the Long Lac — Ogoki diversions and that this action has been approved by the Government of the Province.

The Canadian Government is therefore giving appropriate instructions to authorize the additional diversion of 5,000 cubic feet per second at Niagara by the Hydro-Electric Power Commission of Ontario.

I have the honour to be, with the highest consideration, Sir,

Your most obedient, humble servant,

LORING C. CHRISTIE

The Honourable CORDELL HULL,
   *Secretary of State of the United States,*
      *Washington, D.C.*

EXHIBIT B—Continued

DEPARTMENT OF STATE
WASHINGTON
*November 7, 1940.*

SIR:

I have the honor to acknowledge the receipt of your Note No. 340 of October 31, 1940, stating that the Hydro-Electric Power Commission of Ontario is prepared to proceed immediately with the Long Lac — Ogoki diversions of waters from the Albany River Basin into the Great Lakes System and that this action has been approved by the Government of the Province.

I note also that the Canadian Government is giving appropriate instructions to authorize the additional diversion of 5,000 cubic feet per second of water at Niagara Falls by the Hydro-Electric Power Commission of Ontario.

Accept, Sir, the renewed assurances of my highest consideration.

For the Secretary of State:
A. A. BERLE, Jr.

The Honorable
LORING C. CHRISTIE,
*Minister of Canada.*

## EXHIBIT C

[Source: International Joint Commission, Further Regulation of the Great Lakes (1976) at 16-17]

ELEVATION  I·G·L·D·  1955

LAKE SUPERIOR

LAKES HURON - MICHIGAN

LAKE ERIE

LAKE ONTARIO

ELEVATION  I·G·L·D  1955

MONTHLY MEAN WATER LEVELS OF THE GREAT LAKES  1860-1917

Figure 4

875

MONTHLY MEAN WATER LEVELS OF THE GREAT LAKES 1918-1975

Figure 5