Allan C. MILLER and Betty G. Miller, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 3156.

United States District Court, E. D. Michigan, N. D.

Nov. 3, 1979.

**614**

Peter C. Jensen, Asst. U. S. Atty., Bay City, Mich., for United States, defendant.

Allan C. Miller, pro se.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Plaintiffs commenced this action under 28 U.S.C. § 1346(a)(2) and (b) and the Boundary Water Treaty of 1909 between the United States and Canada to recover damages for injury to their property allegedly occasioned by defendant's construction and operation of the floodgates at the outlet of Lake Superior near Sault Ste. Marie. This Court initially dismissed plaintiffs' complaint in its entirety. See *Miller v. United States,* 410 F.Supp. 425 (ED Mich. 1976), *rev'd in part* 583 F.2d 857 (CA 6, 1978).

On appeal, the Sixth Circuit held that the Boundary Waters Treaty of 1909, 36 Stat. 2448 (1909), did not create a private right of action for a United States citizen against his own government and affirmed this Court's dismissal of Count I of plaintiffs' complaint for relief based on the Treaty of 1909. *Miller v. United States,* 583 F.2d at 860.

The Court of Appeals reversed this Court's dismissal of Counts II and III of plaintiffs' complaint and remanded this ac-

tion for an evidentiary hearing. On remand, this Court was to determine whether the United States, through construction or operation of the control gates at the outlet of Lake Superior, had either "taken" plaintiffs' property in violation of the Fifth Amendment and Tucker Act, 28 U.S.C. § 1346(a) as alleged in Count II of the complaint or had negligently operated the locks and control gates so as to be liable to plaintiffs under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) as alleged in Count III of the complaint.

In brief, plaintiffs allege that defendant's activities connected with the operation of the compensating gates at the Sault in 1968 caused an increase in the level of Lake Huron which resulted in submersion and erosion of their lake front lot. Plaintiffs allege that defendant's activities in 1968 caused damage not only in that year but thereafter and in particular in 1970.

On October 23rd and 24, 1979, the Court heard testimony relative to the issues presented in Counts II and III and accepted exhibits # 1 through # 74 into evidence.

On October 24, 1979, the Court heard the final arguments of counsel in this matter and took the action under advisement.

Upon a review of the entire record, the Court hereby sets forth its findings of fact and conclusions of law pursuant to F.R. Civ.P. 52(a).

### FINDINGS OF FACT

(1) The United States and Canada entered into the Boundary Waters Treaty of 1909 to prevent disputes regarding the use of boundary waters and to make provision for the adjustment and settlement of questions between the United States and the Dominion of Canada involving the rights, obligations or interests of either in relation to the other or to the inhabitants of the other. Plaintiffs' Exhibit No. 1.

(2) An International Joint Commission (hereinafter IJC) composed of three Canadian and three United States members was established pursuant to the Boundary Waters Treaty. The IJC was created to

pass over questions affecting the boundary waters of the two countries. Specifically, the IJC is to approve any . . . uses or obstructions or diversions, whether temporary or permanent of boundary waters on either side of the line, affecting the natural level or flow of boundary waters on the other side of the line. Boundary Waters Treaty, Article III, 36 Stat. 2448 (1909). Plaintiffs' Exhibit No. 1.

(3) In May of 1914, the IJC created the Lake Superior Board of Control (hereinafter LSBC) to oversee and regulate all compensating works, power canals and the amount of water available for power plants in the area. The objective of the LSBC is to maintain the level of Lake Superior between 602.1 ft. and 603.6 ft. above the mean tide at New York. The LSBC is composed of one officer of the United States Corps of Engineers on the American side and one officer appointed by Canada.

(4) The United States Army Corps of Engineers is an agency of the United States and members of the Corps serve as agents to the LSBC.

(5) Precipitation is the key factor contributing to a variation in water levels within the Great Lakes Basin. Testimony of B.G. DeCooke.

(6) The mean long term average level of Lake Michigan—Huron is 578.7 feet above the standard mean water level at Father's Point, Quebec. Defendant's Exhibit No. 63.

(7) The level of Lake Michigan—Huron was at a record low between February of 1964 and January of 1965. This was the result of an unusually low level of precipitation during the years 1962 through 1964. During that period of time, the precipitation level was 11.5 inches below average for the Lake Michigan basin and 7.2 inches below the norm for the Lake Huron basin. Since this period, however, precipitation on the lakes has increased to above average amounts and Lake Michigan—Huron returned to average water level in 1969. Plaintiffs' Exhibit No. 22, p. 2.

(8) In 1968, the precipitation for Lake Superior was at an extreme record high resulting in a rainfall of 37.96 inches for that year compared to an average rainfall of 29.56 inches. The 1968 precipitation for Lake Superior was about 2¼ inches above the previous high set in 1950. Superior normally has the lowest annual precipitation rate of any of the Great Lakes. In contrast, the precipitation for Lake Michigan—Huron for the same period was only slightly above the average of 31.16 inches at 34.29 inches. Plaintiffs' Exhibit No. 43, p. 8.

(9) The St. Mary's River is the only water connection between Lake Superior and the other Great Lakes. There is a section of the St. Mary's River, referred to as the St. Mary's Rapids, where the water falls approximately 21 feet from the level of Lake Superior to Lake Michigan—Huron. This natural barrier to navigation necessitated the construction of the locks complex at Sault Ste. Marie (hereinafter referred to as the Soo Complex). Plaintiffs' Exhibit No. 22.

(10) The outflow of Lake Superior is artificially controlled by regulatory works consisting of a series of navigational locks, hydroelectric power plants and compensating gates located at the Soo Complex. Plaintiffs' Exhibit No. 22.

(11) The sum of these regulatory works at the Soo Complex vests the United States and Canada with full joint control of the outflow of Lake Superior. In contrast, Lake Michigan—Huron is uncontrolled; that is, Lake Michigan—Huron is subject only to natural flow. Plaintiffs' Exhibit No. 70; testimony of B.G. DeCooke.

(12) There is a total of 16 compensating gates at the Soo Complex. Operation of these gates is dependent upon an overall plan for control of the outflow of Lake Superior which is authorized by the IJC and implemented and modified on a monthly basis by the LSBC, depending upon variable conditions on all the lakes. The regulation plan in effect in 1968 was the September 1955 Modified Rule of 1949. Plaintiffs' Exhibit Nos. 70, 42; testimony of B.G. DeCooke.

(13) The United States Government owns and operates the eight compensating gates closest to the United States. These gates are maintained by the Edison Sault Electric Company. The eight gates closest to Canada are owned and operated by the Canadian Government. Plaintiffs' Exhibit No. 70.

(14) Operation of the compensating gates is accomplished manually by employees of the Edison Sault Electric Company under the direction of a member of the Army Corps of Engineers acting in his capacity as on-site representative to the LSBC. Plaintiffs' Exhibit No. 70; testimony of B.G. DeCooke.

(15) The 1955 Modified Rule of 1949 is designed to provide regulation of Lake Superior water levels. It is a zone type regulation plan which provides for the discharge of water into Lake Huron—Michigan from Lake Superior when the water of the latter reaches a certain height. The rule curve has been designed so as not to disrupt the natural water levels of the lower lakes. Plaintiffs' Exhibit No. 42; testimony of B.G. DeCooke.

(16) The regulated discharge from Lake Superior is determined on the first of every month and is a function of the mean Lake Superior level for the previous months. During the winter months, usually from December 1st until April 30th the discharge of water varies from a minimum of 55,000 cfs to a maximum of 85,000 cfs. The latter figure, based on experience with ice jams is considered to be a safe maximum figure. The outflow for the winter months is fairly fixed except for the rare instances when the mean lake level moves to or from the maximum or minimum range of 0.2 ft. specified on the rule curve adopted in the 1955 September Modified Rule of 1949. During the summer months, usually from May 1 to November 30, the maximum outflow is all 16 compensating gates open plus 65,000 cfs of water through the power canals and navigation locks, or about 125,000 cfs. The minimum summer outflow is 58,000 cfs. Plaintiffs' Exhibit No. 48, p. 28.

(17) In late June or early July of 1968, Mr. B.G. DeCooke, Assistant Chief, Engineering Division, and Chief of the Great Lakes Hydraulics and Hydrology Branch of the United States Army Corps of Engineers acting in his capacity as Technical Representative to the LSBC conferred on the phone with Mr. Witherspoon, his Canadian counterpart, regarding the regulation of water levels in the Lake Superior basin. After receiving information on the various lake levels and meteorological conditions, both antecedent and forecasts, DeCooke and Witherspoon applied the pertinent information to the modified Rule Curve of 49 and jointly determined that in order to maintain the level of Lake Superior within the range agreed to by the IJC, an additional amount of water was required to be discharged into Lake Michigan—Huron. (Testimony of B.G. DeCooke.)

(18) Subsequent to their phone conversation of July, 1968, DeCooke and Witherspoon acting in their capacities as technical representatives to the LSBC conveyed their recommendation to the LSBC that a sufficient number of compensating gates be opened to allow the discharge of 100,000 cfs of water from Lake Superior into Lake Michigan—Huron in the month of July. (Testimony of B.G. DeCooke.)

(19) On July 3, 1968, the Lake Superior Board of Control (LSBC) directed that the setting of the compensating gates be changed from ½ gate open to 8 gates open to provide for a discharge of 100,000 cfs into Lake Michigan—Huron. Defendant's Exhibit No. 59B.

(20) Mr. Aune, District Engineer for the Army Corps of Engineers at the Soo Complex, acting as on-site representative to the LSBC, supervised the employees of Edison Sault Electric Company in opening the additional gates on July 5, 1968. Mr. Aune notified Brigadier General R.M. Tarbox, the American member of the LSBC that the gate openings had been accomplished over a two-day period. Defendant's Exhibit No. 59B.

(21) A press release was sent to A.P. which indicated that changes were to be made in the amount of water discharged from Lake Superior in the month of July, 1968. This was part of the standard procedure in-

volved in making modifications in the amount of water discharged from Lake Superior into Lake Michigan—Huron. (Testimony of B.G. DeCooke.)

(22) The 100,000 cfs discharged from Lake Superior into Lake Michigan—Huron is the sum of the 3,000 cfs utilized to operate the locks during the month, the 65,000 cfs utilized in the operation of the hydroelectric power plants at the Soo Complex, and 1,500 cfs discharged by the constant maintenance of one compensating gate remaining half open for the fishing habitats along with an additional 35,000 cfs which resulted from the opening of 7½ gates pursuant to the LSBC directive of July 3, 1968. (Testimony of B.G. DeCooke.)

(23) During the month of July, 1968, the level of Lake Superior, due primarily to high precipitation levels, rose approximately one-half foot. During that same time, the level of Lake Huron—Michigan rose less than two inches. Defendant's Exhibit No. 17; testimony of B.G. DeCooke.

(24) On August 1, 1968, technical representatives to the LSBC, DeCooke and Witherspoon conferred and, after applying the Modified Rule of 1949 to the pertinent meteorological and lake level information, determined that excessive precipitation in the Lake Superior basin accompanied by increases in the lake level necessitated the discharge of greater amounts of water from Lake Superior into Lake Michigan—Huron. DeCooke and Witherspoon conveyed their recommendations to their respective members of the LSBC. Plaintiffs' Exhibit No. 43.

(25) On August 1, 1968, the LSBC ordered that the setting of the control works be modified to 16 compensating gates fully opened. Brigadier General R.M. Tarbox, the American member of the LSBC directed the commission's on-site representative, Mr. Aune, to cooperate with the Canadian representative, Mr. Bouchard, in making the changes. The change was ordered to be made as soon as possible "consistent with providing acceptable conditions downstream." Plaintiffs' Exhibit No. 7.

(26) The eight additional gates of the compensating works were opened between August 2 and 6, 1968. The net effect of 16 gates open was to discharge a total of 125,000 cfs into Lake Michigan—Huron from Lake Superior in the month of August, 1968. Defendant's Exhibit No. 59.

(27) Prior to adjusting the compensating gates in August of 1968, a brief press release was sent to the A.P. indicating that changes were to be made in the amount of water to be discharged into Lake Michigan during the month of August. In subsequent years, the press releases sent to the A.P. and local media were more detailed and gave more extensive warnings to lower riparian owners regarding the effect that changes in water level could have on their property. Testimony of B.G. DeCooke.

(28) Throughout 1968, the water level of Lake Michigan—Huron remained at or below the long-term annual mean of 578.7 ft. The level of Lake Superior prior to July, 1968 was one-half foot above the average level while that of Lake Michigan—Huron was one-half foot below the average level. Defendant's Exhibit No. 63; testimony of B.G. DeCooke.

(29) The net effect of man's intervention in the Great Lakes Systems has been to slightly reduce the level of Lake Michigan—Huron in 1968 from the level it would have been at absent man-made changes. These reductions in water level have resulted in part from the Army Corps of Engineers' dredging of the Detroit—St. Clair River and construction of the compensating works at the Sault as well as other projects carried out by the Army Corps of Engineers. The range of the lake levels is about equivalent to that experienced without the benefit of man's intervention, but the net level of Lake Michigan—Huron has been reduced. Defendant's Exhibit No. 64A and 64B; testimony of B.G. DeCooke.

(30) In 1964, pursuant to a joint reference to the IJC by the United States and Canada, a Great Lakes Study Board was established by the IJC to investigate and study whether "measures within the Great Lakes basin would be taken in the public interest

to further regulate the levels of the Great Lakes or any of them and their connecting waters so as to reduce the extremes of stage which have been experienced." Plaintiffs' Exhibit No. 35, p. 1.

(31) The Great Lakes Study Board, in a report to the IJC, dated December 7, 1973, suggested that, as an alternative to the Modified Rule of 49, the IJC implement a plan entitled SO–901. The plan would shift the emphasis from maintenance of Lake Superior within a certain level to a consideration of the entire Great Lakes basin. The fundamental principle of Plan SO–901 is to manipulate the St. Mary's River flow in such a way as to keep the levels of Lakes Superior and Michigan—Huron at relatively the same position with respect to their mean levels, i. e., the same number of standard deviations from their respective means. Plaintiffs' Exhibit No. 35, p. 105 et seq.

(32) In the summer of 1968, plaintiffs Allan C. and Betty G. Miller purchased a brick house situated on a 60′ by 160′ lot located at 1026 Ottawa Lane in Baldwin Township, Iosco County, Michigan, for $35,000.00. The lot occupied 60 feet of frontage on a bluff overlooking Lake Huron and ran for 160 feet back from the bluff toward the road. The house, constructed in 1963, was placed approximately 140′ back from the edge of the bluff. Though the lot measured 60′ × 160′, the plat provided that all lots were to run to the waters' edge. This meant that a lot owner enjoyed approximately 150′ of additional land running to the edge of Lake Huron from the bluff. Plaintiffs' Exhibit No. 28; testimony of Allan C. Miller.

(33) Plaintiff Allan Miller, prior to purchasing the house located at 1026 Ottawa Lane, examined the vegetation in the area in front of the house and between the bluff and the beach. The presence of three trees between the bluff and the lake which plaintiff determined to be at least fifteen years old and a third tree which appeared considerably older, demonstrated to him that his property was reasonably secure from damage caused by extreme high waters such as

those which occurred in Lake Huron during 1951 and 1952. Plaintiff did not confer with any member of the Army Corps of Engineers or a person trained in hydrology regarding high water but rather relied on his personal observations of the vegetation and beach in existence at the time of his purchase in 1968. Testimony of Allan C. Miller.

(34) In the period between 1950 and 1956, a period of record high water levels in Lake Michigan—Huron, the all over average level for the lake exceeded 580 feet. Since the ordinary high water mark for Lake Huron is 580.8 feet, the 1950–56 period was a time when the general water level was so high as to either equal or exceed the ordinary high water mark. In contrast, the level of Lake Michigan—Huron did not exceed the long-term average level of 578.7 feet at any time in 1968. Defendant's Exhibit No. 63, 68 and 69; testimony of B.G. DeCooke.

(35) Both plaintiffs and defendant were aware of the severe erosion problem on the shores of Lake Huron at the time of plaintiffs' purchase. The Army Corps of Engineers had determined that the shore in the proximate area of plaintiffs' realty had eroded between 10 and 30 feet during the 1951–52 period of high water. Plaintiff was familiar with the significant erosion problem from personal observation of the situation throughout his lifetime in the area. Plaintiffs' Exhibit No. 19, p. 144; testimony of Allan C. Miller.

(36) During the summer of 1968, plaintiffs did not personally receive a warning from either the Army Corps of Engineers or the media regarding anticipated high water levels or any notice of modifications in the compensating gates at the Soo Complex.

(37) On Thanksgiving weekend of 1968, a severe wind and rain storm occurred in the area of plaintiffs' property. The lake water, agitated by the wind storm, rose and covered the beach in front of plaintiffs' home and eroded the dune fronting their property. The water seeped through the basement walls and resulted in severe damage to their house and lot. Trees and other vegetation were killed as a result of the

rising water. Plaintiffs' Exhibit No. 37, No. 41.

(38) Plaintiffs initially attempted to repair the destruction caused by the Thanksgiving weekend storm by constructing a barrier of railroad ties, or rip-rap. When that barrier proved inadequate, they constructed a rock breakwall across the area where the bluff had formerly been. Plaintiffs' Exhibit Nos. 69, 41B–D, 31.

(39) Plaintiffs continued to suffer damage from the fluctuations in the water level from the time of the 1968 Thanksgiving weekend storm in which their beach and dune were significantly eroded. In particular, plaintiffs were severely damaged in 1970 when their breakwall failed to hold during a time when the water was consistently above the long-term annual mean of 578.7 feet. Plaintiffs' Exhibit No. 41B–D; Defendant's Exhibit No. 63.

(40) Plaintiffs made significant improvements to their property throughout their ownership, including the construction of a garage and deck and blacktopping a driveway. Plaintiffs sold their house and lot located at 1026 Ottawa Lane for $43,000.00 in 1976.

## CONCLUSIONS OF LAW

*A. Jurisdiction*

(1) The Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1346(a)(2) and (b).

*B. Tucker Act, 28 U.S.C. § 1346(a)(2)*

(2) Section 1346(a)(2) states in pertinent part that the district court shall have original jurisdiction, concurrent with the Court of Claims, of:

"Any other civil action or claim against the United States, not exceeding $10,-000.00 in amount founded . . . upon the Constitution . . ."

28 U.S.C. § 1346(a)(2).

(3) The Fifth Amendment to the United States Constitution provides in part that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation."

(4) The navigable servitude of the United States extends to the ordinary high water level. 33 CFR 329.11(a).

(5) Private parties do not have a right against the United States to control the speed or direction of current in navigable waters and, if they are harmed by changes in the flow of such waters, they have no cause of action against the United States. *Pitman v. United States*, 457 F.2d 975, 977 (Ct.Cl.1972).

(6) The ordinary high-water mark on non-tidal waters is the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear natural line impressed on the bank, shelving, changes in the character of the soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas. *United States v. Cameron*, 466 F.Supp. 1099 (M.D. Fla.1978).

(7) If owners of lakefront property establish that the proximate cause of a lake's raised water levels and submersion and erosion of their land was the release of water from Lake Superior through locks and control gates by employees of the United States, and that their property had been physically occupied on a permanent basis not merely by altering the flow of the water and causing erosion, but because of a deliberate act of raising the "natural" level of Lake Huron above the ordinary high water mark, they would be entitled to compensation for taking of their private property. *Miller v. United States*, 583 F.2d 857 (CA 6, 1978); *Pitman v. United States, supra.*

(8) Inasmuch as plaintiffs have failed to establish either that the natural level of Lake Michigan—Huron in 1968 had been raised by man's intervention in the Great Lakes System or that at any point during 1968 the water level in Lake Michigan—Huron exceeded the long term annual mean, the Court concludes that plaintiffs

have failed to demonstrate that any damage to their fastlands in 1968 or later was occasioned by a deliberate act on the part of the Army Corps of Engineers or any agent of the United States Government in July and August of 1968 to raise the natural level of Lake Huron above the ordinary high water mark. Court's Finding of Fact Nos. 7, 23, 26, 28, 29.

(9) Further, the Court concludes that plaintiffs have failed to show that a proximate or even consequential result of any action by the United States in releasing water from Lake Superior into Lake Michigan—Huron during July and August of 1968 was the erosion and submersion of their land. Court's Finding of Fact Nos. 29, 37.

(10) Accordingly, the Court will enter judgment for defendant and against plaintiffs on the claim under the Fifth Amendment and Tucker Act, 28 U.S.C. § 1346(a)(2), alleged in Count II of the Complaint.

### C. Federal Tort Claims Act, 28 U.S.C. § 1346(b)

(11) Section 1346(b) provides in part that "the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, occurring on and after January 1, 1945, for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

(12) The provisions of 28 U.S.C. § 1346(b) do not apply to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

■ (13) The discretionary function exception to liability under the Federal Tort Claims Act does not insulate the government from liability for all mistakes of judgment of its agents, but only for significant policy and political decisions, the types of governmental decisions which should not be circumscribed by customary tort standards. *Miller v. United States*, 583 F.2d 857 (CA 6, 1978).

■ (14) The "discretionary function exception" does not immunize the government from liability for the manner in which its agents raise and lower the flood gates at Sault Ste. Marie, or for their mistakes in judging or measuring how much water is going through the gates, or for their failure to observe regulations governing their activities. The discretionary function exception does, however, insulate the government from tort liability for deliberate official decisions and directives requiring lake levels to be maintained within a certain range. *Miller v. United States*, 583 F.2d 857 (1978).

■ (15) Even if plaintiffs had succeeded, which they have not, in showing that the decision to regulate the Great Lakes by application of the September 1955 Modified Rule of 1949 instead of an alternate plan such as proposed in SO–901 was the decision of an employee of the United States rather than that of a member of an international commission, there could be no recovery against the government since the decision would be clearly within the discretionary exception to allowable claims under the Federal Tort Claims Act. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

(16) In determining claims under the Federal Tort Claims Act, the law of the place where the act or omission occurred is utilized. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 28 U.S.C. § 1346(b).

■ (17) Michigan utilizes the common law of negligence. That is, plaintiff must demonstrate not only that defendant employees of the United States breached a duty of care owing to plaintiffs but also that any injuries sustained by plaintiffs were proximately caused by defendant's breach. Under Michigan law, "negligence" with respect to defendant's conduct means "the failure to do something a reasonably careful person would do or the doing of something which a reasonably careful person would not do under the circumstances which existed at the time." MSJI 10.01; *Frederick v. City of Detroit*, 370 Mich. 425, 121 N.W.2d 918 (1963); *Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977).

(18) Under Michigan law "proximate cause" means first that "there must be a connection between the conduct of the defendant which plaintiffs claim was negligent, and second, that the occurrence which is claimed to have produced the injury was a natural and probable result of such conduct of the defendant." MSJI 15.01; *Selph v. Evanoff*, 28 Mich.App. 201, 184 N.W.2d 282 (1970).

■ (19) Applying the principles of negligence as recognized under Michigan law to the case at hand, the Court concludes that plaintiffs have failed to establish that defendant United States breached any duty of care owed to plaintiff in the operation of the Soo Complex or specifically in the opening and closing of the compensating gates in July and August of 1968. Plaintiffs have alleged that defendants failed to warn downstream riparian owners of the modifications made the compensating gates, but the Court finds that the evidence indicates otherwise and that defendant has not been shown to have failed to do something a reasonably careful person would do under the circumstances which existed at the time.

(20) Further, the Court finds that plaintiff has failed to establish that the proximate cause of the submersion and erosion of their land during Thanksgiving week-end of 1968 and thereafter, particularly in 1970, was the operation of the compensating gates at the Soo Complex in July and August of 1968.

(21) For the foregoing reasons, the Court will enter judgment for defendants and against plaintiffs on the claim for relief under the Federal Tort Claims Act.

Consistent with the foregoing, plaintiffs' claims for relief under the Fifth Amendment and Tucker Act and Federal Tort Claims Act are HEREBY DENIED.

IT IS SO ORDERED.

### JUDGMENT

For the reasons set forth in the Memorandum Opinion and Order issued this date;

IT IS ORDERED AND ADJUDGED that the plaintiffs take nothing, and that the action be dismissed on the merits. Each party is to pay its own costs of action.